**STATE of Missouri, Respondent,**

v.

**Stacy SHELTON, Appellant.**

**No. WD 60141.**

Missouri Court of Appeals, Western District.

May 21, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 2002.

---

Tara L. Jensen, Asst. Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty, Gen., Jefferson City, for Respondent.

Before ROBERT G. ULRICH, P.J., PATRICIA A. BRECKENRIDGE and LISA WHITE HARDWICK, JJ.

ROBERT G. ULRICH, Presiding Judge.

Stacy Shelton was convicted following a jury trial of first degree burglary, section 569.160;[1] second degree robbery, section 569.030; forcible rape, section 566.030; three counts of forcible sodomy, section 566.060; kidnapping, section 565.110; and sexual abuse, section 566.100; and was sentenced to four life and four thirty year sentences. Mr. Shelton contests only his conviction for kidnapping. He argues that the trial court erred in overruling his judgment of acquittal at the close of all the evidence because insufficient evidence was presented to support his conviction for kid-

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

napping. The judgment of conviction is affirmed.

### Facts

Stacy Shelton was charged by indictment with first degree burglary, second degree robbery, rape, three counts of forcible sodomy, kidnapping, and sexual abuse. An information in lieu of indictment was later filed, charging Mr. Shelton as a prior and persistent offender.

V.F., an out of state resident, was working at a trade show as a representative of her employer on June 16, 1999, and was staying at a downtown hotel. That evening, V.F. was in her room when the hotel fire alarm sounded. V.F. and the rest of the hotel guests exited the building.

After the fire alarm was determined to be a false alarm, V.F. got on the elevator to return to her room. Two men were already on the elevator. When the elevator reached V.F.'s floor, V.F. got off the elevator and the two men followed and passed V.F. in the hall; the men were talking about meeting someone. V.F., believing that the men were out of the hallway, turned to her room and inserted her key card to enter the room. Just as her door opened, V.F. heard "Get her," and one of the men tackled V.F. from behind so that her arms were held to her side. V.F. then saw a hand push the room door open and she and the two men fell to the floor halfway in the room. She tried to fight, yell, and break away, but the men had a tight hold on her, and one of the men covered her mouth with his hand. The men told V.F. to be quiet or they would kill her, pulled her into the room, and shut the door.

Inside the room, V.F. was on her stomach; one of the men was holding her head down. V.F. began to hear the tearing of bed sheets. The men then bound V.F.'s legs, blindfolded her, and, at some point, gagged her with torn bed sheets. The men asked V.F. if she had money, and she told them she had about $200. V.F. was wearing a backpack-style purse, so they released her arms, removed the purse, and then re-tied her arms. As the men divided V.F.'s money, they bickered about whether one of them had been cheated ten dollars.

After the men had divided V.F.'s money, they rolled V.F. on her back, unhooked her jeans and pulled them off. They then ripped off her bra. The two men argued about which one of them would use the only condom they had purchased. The man who was going to use the condom told the other to go into the bathroom and find something plastic to use. From underneath the blindfold, V.F. could see one of the men, kneeling on the floor, opening up the condom wrapper, but she could not see his face. The other man was in the bathroom at that point.

The man with the condom raped V.F. When he was finished, he turned V.F. over, on her stomach, and sodomized her anally. As he did so, the other man who had been in the bathroom came out, knelt by V.F., and stroked her hair. V.F. began to pray. As her voice grew louder, one of the men said, "Are you praying?" "Yes," V.F. answered. The man told her to stop and hit her in the head. Throughout the episode, whenever V.F. made any noise, the men would hit her and tell her to be quiet, threatening to kill her.

After the first man had finished, the two men picked her up and put her on the bed on her stomach and the second man forcibly sodomized V.F. anally. The men then moved her over to the desk, bent her over the desk, and the second man raped V.F. anally.

After the second man concluded, the two men put V.F. on the floor and re-bound her legs with the torn bed sheets. While

one of the men tightened V.F.'s gag and blindfold, the other wiped down the room. One of the men tried to pull off V.F.'s wedding ring, but was unsuccessful.

As the men prepared to leave, they talked about putting V.F. in the closet or in the bathroom. One of the men said that he had already killed two people and he would kill V.F. The men then removed the mattress from the bed and placed it on top of V.F. The men instructed V.F. to stay underneath the mattress and not to move. One of the men said that he was going to wait five minutes and come back to the room and check on V.F. and if she had moved, he would kill her. The men departed the room.

V.F. was eventually able to free her hands and remove the blindfold. She ran to the door, and locked the deadbolt. The phones in her room had been pulled out of the walls, so V.F. dressed herself, and pounded on doors until an occupant answered. V.F. explained to the occupants who answered that she had been attacked. The gag and blindfold were still wrapped around V.F.'s neck because she had been unable to remove them. The occupants called hotel security.

Officer Jeffrey Duer, a police officer with the Kansas City, Missouri, Police Department, was working his off duty hours as a security officer at the hotel. At about 9:45 p.m., the supervisor of the hotel security accompanied Officer Duer to the 17th floor where they met with V.F. and she related the events that had taken place and described her assailants.

The crime scene was secured, and evidence was later obtained, including torn bed sheets, one of which contained a piece of chewed gum; pieces of a condom wrapper; a used condom, found in the toilet; blood samples; a wet towel; and a night gown.

V.F. was taken to the hospital where a SAFE exam was performed, and her clothing was collected. The nurse who performed V.F.'s SAFE exam noted significant swelling of the vulva, several lacerations to the rectal area, one large vaginal tear, and significant bruising in the vaginal area. The nurse later testified that significant force had been used against V.F.

Through various tips and leads, the police were led to the defendant and Dedrick Rockett. Fingerprints, blood and hair samples were collected from the two men. Fingerprints found on the condom wrapper belonged to Mr. Rockett and a pubic hair found on V.F. was consistent with Mr. Shelton's pubic hair. DNA testing demonstrated that the chewing gum found in the knotted and torn bed sheet had been chewed by Mr. Shelton and that his sperm was found in V.F.'s rectum. The criminalist who testified at trial stated that scientific testing of the biological evidence removed from V.F. demonstrated that no one other than Mr. Shelton and Mr. Rockett had participated in the crimes alleged.

Mr. Shelton testified in his own defense at trial and claimed that he was locked inside the Kansas City Community Release Center at the time of the rape. He testified that on June 16, 1999, he spent the day looking for a job and had returned to KCCRC around 2:30 p.m. Testimony disclosed that inmates could easily sneak in and out of the Release Center.

The jury found Mr. Shelton guilty of first degree burglary, second degree robbery, forcible rape, three counts of forcible sodomy, kidnapping, and sexual abuse. The trial court, having previously found Mr. Shelton to be a prior and persistent offender, sentenced Mr. Shelton to thirty years imprisonment on the burglary, robbery, kidnapping, and sexual abuse counts and to life imprisonment on the forcible

rape and sodomy charges, each sentence to run consecutively. This appeal followed.

## Analysis

Mr. Shelton essentially raises two claims in his sole point on appeal. He first challenges the sufficiency of the evidence on the charge of kidnapping. He also argues that he was unfairly subjected to multiple punishments.

The kidnapping charge, section 565.110, alleged that Mr. Shelton unlawfully confined V.F. without her consent for a substantial period for the purpose of facilitating the commission of her forcible rape and sodomy and flight after the commission of the offenses. Mr. Shelton cites the body of case law that states that kidnapping is not a proper charge if the movement or confinement of the victim is incidental to another offense.

## Standard of Review

In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether sufficient evidence was presented from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Morrow*, 941 S.W.2d 19, 21 (Mo.App. W.D.1997). This court, in reviewing the defendant's conviction, must accept as true all evidence, whether direct or circumstantial, tending to prove the defendant's guilt. *Id.* This court must also accept all reasonable inferences supporting the verdict while disregarding all parts of the record contrary to the verdict. *Id.* This court does not weigh the evidence. *Id.*

## Charge of Kidnapping

Kidnapping is defined as "unlawfully remov[ing] another without . . . consent from the place where [they are] found or unlawfully confin[ing] another without

. . . consent for a substantial period, for the purpose of . . . [f]acilitating the commission of any felony or flight thereafter." § 565.110. The offense of kidnapping should not be charged in instances where the movement or confinement is merely incidental to another offense. *State v. Williams*, 860 S.W.2d 364, 366 (Mo.App. E.D.1993). To determine whether a defendant's actions of moving and confining his victim are incidental to another offense or are sufficient by themselves to constitute the offense of kidnapping, this court looks to see if any increased risk of harm or danger to the victim resulted from the movement or confinement of the victim that was not present as a result of the other offense. *Id.*

Although the State must prove an increased risk to the victim because of the movement or confinement, the increase in risk need not be inherent in the movement or confinement itself. *State v. Tomlin*, 864 S.W.2d 364, 367 (Mo.App. E.D. 1993). The additional risk necessary to sustain a conviction of kidnapping may be established by showing that the remoteness or privacy of the area to which the victim was confined created the potential of more serious criminal activity. *Id.* Whether the asportation or confinement of the victim necessary to commit the offense of kidnapping occurs depends on the facts of each case. *State v. Jackson*, 703 S.W.2d 30, 33 (Mo.App. E.D.1985).

The State cites *Williams*, 860 S.W.2d at 366 to support its contentions that: 1) the evidence of confinement was sufficient to convict Mr. Shelton of kidnapping; and 2) Mr. Shelton was not subjected to multiple punishments. In *Williams*, defendant attempted to rape the victim by pushing her into a parked automobile and attacking her. *Id.* Defendant argued that his confinement of the victim was merely incidental to the attempted rape and that he had,

therefore, been unfairly subjected to multiple punishments for the merged offenses of rape and kidnapping. *Id.* In upholding the kidnapping conviction, the Eastern District reasoned that:

> Here, defendant pushed D.M. into her automobile and confined her there. There was evidence that defendant tried to force her to drive to another location. By his actions, defendant increased the risk of harm or danger to D.M. and created the potential for more serious criminal activity. Defendant's confinement of D.M. in the automobile made her escape more difficult and made it less likely for his criminal activity to be observed by witnesses. Undoubtedly, the isolation and decreased possibility of help added to D.M.'s terror. Had defendant succeeded in forcing D.M. to drive to an even more remote area, he would have increased his ability to prolong his sexual assault and make it more violent. *Id.*

Sufficient evidence existed that the forcible confinement of V.F. was not merely incidental to the rape and sodomy of V.F. but rather increased the risk of harm to V.F. The record reveals that Mr. Shelton helped confine V.F. to her hotel room by binding her arms and legs, blindfolding her eyes, and gagging her with torn bed sheets. Mr. Shelton's actions to confine V.F. in the hotel room increased the risk of even more serious criminal activity and greater harm and danger to V.F. V.F.'s confinement made her escape more difficult, and Mr. Shelton's criminal activity was less observable. V.F.'s prayer during the episode as well as her isolation and the decreased possibility of assistance are evidence of the terror that she experienced. Terror that a victim experiences during the commission of a crime is a harm that the kidnapping statute is intended to address. *Morrow,* 941 S.W.2d at 21

("[Victim]'s repeated prayers during the episode were evidence of the terror she experienced."). The facts of this case demonstrate that V.F.'s confinement was more than incidental to the rape and sodomy.

Sufficient evidence was presented from which a reasonable trier of fact could have found Mr. Shelton guilty of kidnapping in violation of section 565.110. Mr. Shelton was not unfairly subjected to multiple punishments. Point denied.

The judgment of conviction is affirmed.

BRECKENRIDGE and HARDWICK, JJ., concur.