STATE of Missouri, Respondent,

v.

Spencer Nelson HARDING, III, Appellant.

No. WD 71531.

Missouri Court of Appeals, Western District.

Sept. 21, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 2, 2010.

Janet M. Thompson, Columbia, MO, for Appellant.

Shaun J. Mackelprang, Jefferson City, MO, for Respondent.

Before LISA WHITE HARDWICK, C.J., JAMES EDWARD WELSH, J., and BRIAN C. WIMES, Sp. J.

JAMES EDWARD WELSH, Judge.

Spencer Nelson Harding, III, appeals the circuit court's judgment convicting him of murder in the first degree. He asserts that the circuit court erred and abused its discretion in overruling his motion to exclude and strike the testimony and reports of the State's DNA analyst and in considering DNA evidence that lacked statistical analyses. He also contends that the evidence was insufficient to convict him of murder in the first degree. We disagree and affirm the circuit court's judgment.

Viewing the evidence in the light most favorable to the verdict, the evidence established that on October 29, 2005, Molly McWilliams and Harding were at a local drinking establishment in Carrolton, Missouri, called "The Bar." That evening, the managing officer of The Bar saw McWilliams and Harding talking to each other inside the bar. Both McWilliams and Harding, stayed at the bar until closing time, which was around 1:15 or 1:30 a.m., on October 30, 2005. After closing, McWilliams and Harding continued talking to each other outside the bar by Harding's pickup truck, which was a white Ford pickup truck with a Ray/Carroll sticker that had been taken off the door.[1] Jeremy Dodds, who was also leaving the bar, stopped at Harding's truck and talked to Harding briefly. According to Dodds, Harding and McWilliams were standing next to the truck with the driver's door open, and it appeared to him that they were getting ready to get inside the truck.

A local gas station's video surveillance tape establishes that Harding entered the gas station around 1:40 a.m. and left the station at 1:44 a.m. The surveillance video also shows that Travis Constant entered the gas station at 2:03 a.m.

---

1. Evidence was presented that Harding had had a "Ray/Carroll" agricultural cooperative sticker removed from the door, but the door still had a faded circle with writing on it from the removal of the sticker.

Sometime after 2:00 a.m., on October 30, 2005, Travis and Kristina Constant were out for a drive, and they saw a white Ford pickup truck parked on the wrong side of the road next to a field where McWilliams's body would be discovered a few hours later. The pickup truck had a metal, crisscrossed tailgate, a red gas can in the back, a license plate tied on to the tailgate, and a faded circle with writing on it on the side of the door. The Constants later identified the truck as belonging to Harding.

That morning, at around 8:00 a.m., a farmer discovered McWilliams's body lying face down in the field. McWilliams's body was about thirty yards from the road. She had blood in her hair and was wearing a green sweatshirt, blue jeans, and a white sports bra. Grass stains were evident on McWilliams's clothes, and the placement of those stains suggested that the body had been dragged. In an area covered with blood near the body, the police found a pair of purple underwear and a Budweiser beer can. McWilliams was not wearing underwear under her jeans. McWilliams's face was bruised, and blood and bruises were on her hands. Some of the wounds on McWilliams's body appeared to be drag wounds.

An autopsy revealed that the cause of McWilliams's death was strangulation and blunt trauma to the head. McWilliams sustained three deep lacerations to the back of her head, which were consistent with being struck by some sort of weapon. She also sustained numerous abrasions and contusions to various parts of her body and had a fractured left hand. The examiner concluded that the injuries were inflicted while McWilliams was still alive. The examiner said that McWilliams's injuries were consistent with being struck multiple times with an object. Although he could not tell if the injuries were inflicted by more than one person, the examiner said that the injuries were consistent with her having engaged in a struggle. The examiner also concluded that McWilliams had been strangled because she had abrasions on both sides of the neck and a fractured hyoid bone. Further, the examiner found a recently inflicted abrasion on McWilliams's vagina and said that the abrasion was consistent with consensual sex, assault, or rape. He could not make a finding of sexual assault.

On October 31, 2005, the police went to Harding's residence and found his white Ford pickup truck parked out front. The officers asked Harding to accompany them to the major case squad's command post so that they could talk to him, and Harding agreed to go with them. At the command post, Officer Benny Sheffield told Harding that he was not under arrest, that he was free to leave at anytime, and that he did not have to talk to the police. The officer also advised Harding of his *Miranda* rights, and Harding filled out a form waiving his *Miranda* rights.[2]

During the questioning, Harding told the officers that he had heard about the case on the news and that he thought the police would be coming to talk to him. Harding said that he was not surprised that the police came to see him and that he had intentionally stayed home that day because he thought the police would be coming to talk to him. Harding said that he was the usual suspect when something like this happened. Harding told the officers that he been falsely accused of a rape in Carrollton and that he had spent fourteen months in jail because of that false accusation.

Harding told the officers that he had been at "The Bar" on the night in ques-

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tion, and he volunteered that he had seen McWilliams there. He said that he left the bar between 1:15 a.m. and 1:30 a.m. He said that, as he was leaving, McWilliams asked him for gas money so that she could pay some people to take her home. Harding said that he gave her twenty dollars to get her away from him because he thought McWilliams seemed to be high or on drugs at the time. Harding said that McWilliams gave him a hug as she was leaving. Harding then went to his truck. According to Harding, when he got to his truck, someone had poured beer on his seat and had stolen a pack of cigarettes from his glove compartment. Harding said that he then went to the gas station to purchase cigarettes and then went straight home.

Harding told the officers that he washed the truck seat cover the next day to remove the beer. He also told them that he had washed his jeans and shirt that he had worn that night but said that he was wearing the same sweater that he had worn that night. Harding gave the officers the sweater so that they could test it.[3] Further, Harding told the officers that he was the only person who ever drove his truck and that he only drinks Budweiser beer. He said that McWilliams had never been in his truck. When the officers asked Harding if he had ever engaged in sex or oral sex with McWilliams, Harding replied that he never messed around with her and that McWilliams never "did it" with him. He said that McWilliams had "come on to him" on previous occasions but that he had turned her down.

According to Officer Sheffield, he never told Harding during the interview that it was, in fact, McWilliams that was found dead in the field, but Sheffield noted that Harding kept referring to McWilliams in the past tense. When Sheffield told Har-

ding that he was not sure that it was McWilliams in the field, Harding responded that it would be a shame if it was because McWilliams was someone he "really gave a shit about."

Harding consented to the officers' search of his truck and house. During a search of Harding's truck, officers found a cooler in the bed of the truck. The cooler contained two cans of Budweiser beer. The lot numbers on the beer cans in the cooler matched the lot number printed on the can found in the field near McWilliams's body. Authorities also obtained a buccal swab and hair samples from Harding.

Stacey Bolinger, a DNA analyst for the Highway Patrol Lab, examined the interior of the truck for possible blood. When she located possible blood stains in the truck, she tested the stains with a chemical called LMG to determine if blood was present. Bolinger identified several areas in the truck that tested positive for blood. Those areas were: the driver's side interior door panel, the driver's side interior door handle, the steering wheel faceplate, the passenger side floorboard, and the middle seat belt. Because these areas screened positive for the presence of blood, Bolinger swabbed these areas so that DNA tests could be performed. Bolinger also had received the rape kit that the medical examiner had obtained in his examination of McWilliams. Bolinger examined two oral swabs, two rectal swabs, and two vaginal swabs for the presence of semen. Tests on the vaginal swabs and rectal swabs tested positive for semen. Further, Bolinger took swab samples from the mouthpiece of the beer can found in the field to conduct a DNA analysis.

---

**3.** No blood was found on the sweater.

Bolinger then conducted a DNA analysis on the samples she obtained. After amplifying the DNA extracted from the swab of the truck's steering wheel faceplate, Bolinger obtained a DNA profile. She determined it was a single source profile, which she could use as a point of comparison. The profile was consistent with that developed from the known standard of McWilliams. Bolinger also developed a DNA profile from the swab she obtained from the beer can found in the field, which was consistent with the DNA profile developed from the known standard of Harding. For both of those profiles, Bolinger conducted random match probability analyses.[4] According to Bolinger, McWilliams's DNA profile occurs in only 1 in 14.18 quadrillion[5] people in the Caucasian population, and Harding's DNA profile occurs in only 1 in 22.4 quadrillion people in the Caucasian population.

Bolinger separated the sperm fraction from the non-sperm fraction for the vaginal swab. She only obtained a partial profile from the minor contributor of the sperm fraction but developed a full DNA profile consistent with Harding for the major contributor. Bolinger conducted random match probability analysis as to that sample. Again, according to Bolinger, Harding's DNA profile occurs in only 1 in 22.4 quadrillion people in the Caucasian population. Bolinger stated that the major component of the non-sperm fraction for the vaginal swab was consistent with McWilliams. She said that Harding could not be eliminated as a minor contributor to the non-sperm fraction.

Bolinger also re-tested the rectal swabs one year after the initial testing, at the prosecutor's request. She determined that the major component of the non-sperm fraction was consistent with McWilliams. She also determined that the sperm fraction from the rectal swab was consistent with being a mixture of at least two individuals. She said that, as to the sperm fraction from the rectal swab, the major component of that profile was consistent with McWilliams and that Harding could not be eliminated as a source of the minor component. Because, however, Bolinger could not provide random match probability statistics as to those samples, Harding moved to strike Bolinger's testimony at trial, and the circuit court took the objection with the case.

Bolinger was also able to develop partial DNA profiles from the swabs of the driver's side interior door handle and the driver's side interior door panel. The DNA found in these samples consisted of a mixture from at least two individuals. Over objection, Bolinger testified at trial that she could not eliminate Harding and McWilliams as the source of the DNA found on the door panel or door handle. Bolinger also said that she did not perform statistical analyses on these samples. Further, because Bolinger had not reviewed the raw electronic and analyzed data for the samples before trial, she could not testify about the parameters she used for peak detection thresholds.

At the close of Bolinger's testimony, Harding renewed his objection to strike Bolinger's testimony because of her inability to answer questions and provide data which he contended violated his right to confrontation and because Bolinger's testimony lacked statistical data which he con-

---

**4.** According to Bolinger, random match probability is the chance of picking one person out of a million and having that person have the same DNA profile as a profile done in her lab.

**5.** A quadrillion is "the number represented by 1 followed by 15 zeroes." Webster's New World College Dictionary 1172 (4th ed.2002).

tended denied him due process.[6] The circuit court denied the motion and said that it would consider the evidence lacking statistical data. In particular, the court said:

[T]he other DNA evidence, wherein the State did produce evidence of certain frequencies within the population with respect to other DNA evidence, is stronger evidence. And the evidence where the calculation was not done is weaker evidence.

. . . .

The evidence that does not have the calculation with respect to the frequency probability is not as strong as the other evidence. But being consistent is simply going to be given whatever weight that might have.

Harding waived his right to a jury trial. After the trial, the circuit court found Harding guilty of first degree murder and sentenced Harding to life imprisonment with no opportunity for probation or parole. Harding appeals.

■ In his first point on appeal, Harding contends that the circuit court erred and abused its discretion in overruling his motion to exclude and strike the testimony and reports of the State's DNA analyst, Stacey Bolinger, and in considering DNA evidence that lacked statistical analyses. In particular, Harding contends that, because Bolinger refused to answer questions about her conclusions and the methodology she used to review the raw and analyzed electronic data from her DNA testing, his Sixth Amendment right to confront the witness was violated. He also asserts that the circuit court erred in failing to exclude Bolinger's testimony because Bolinger failed to conduct frequency calculations for the random match probabilities on some of the samples that she tested and, therefore, her conclusions were irrelevant. We disagree.

■ The decision of whether to admit expert testimony is left to the sound discretion of the circuit court, and we will not disturb the circuit court's decision absent an abuse of discretion. *State v. Hayes*, 88 S.W.3d 47, 61 (Mo.App.2002). "'This discretion is abused only when the ruling is clearly against the logic of the circumstances, or when it is arbitrary and unreasonable.'" *Id.* (citation omitted).

■ To the extent that Harding contends that his Sixth Amendment right to confront the witness was violated because Bolinger could not answer questions about her conclusions and the methodology she used to review the raw and analyzed electronic data from her DNA testing, his contention is without merit.[7] Bolinger testified at trial and was subject to cross-examination. Whether or not Bolinger could answer specific questions posed by Harding did not deny Harding his rights to confront her under the Sixth Amendment. In his cross-examination of Bolinger, Harding was effectively able to point out that Bolinger had not reviewed the raw and analyzed electronic data from her DNA testing and that she could not testify

---

**6.** The evidence established that Bolinger did give a copy of the raw DNA data to the defense. Inexplicably, Harding was demanding that Bolinger analyze the raw data for the defense. Bolinger refused to do that absent authorization from the State or being directed to do so by the court.

**7.** The State argues that Harding waived appellate review of the Confrontation Clause claim because he had filed a written motion to exclude Bolinger's testimony, and, on the eve of trial, Harding withdrew the motion as part of an agreement with the State on various matters. Although Harding did withdraw his motion to exclude Bolinger's testimony, he told the court that he intended to challenge Bolinger's testimony at trial during cross-examination.

about her decision to consider certain alleles and to disregard other alleles in making her DNA conclusions. The Confrontation Clause is not implicated where the witness is available for cross-examination at trial. *See Crawford v. Washington,* 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *State v. Perry,* 275 S.W.3d 237, 243 (Mo. banc 2009). The Confrontation Clause's guarantee is procedural and "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford,* 541 U.S. at 61, 124 S.Ct. 1354.

■ Harding also complains that the circuit court erred in failing to exclude Bolinger's testimony because she failed to conduct frequency calculations for the random match probabilities on the partial DNA profiles. Harding contends that, without that statistical analysis, Bolinger's conclusions were irrelevant and, therefore, inadmissible.

The evidence established that Bolinger conducted frequency calculations for the random match probabilities on the major component of the sperm fraction from the vaginal swab, the results from the beer can found in the field, and from the results on the steering wheel faceplate. She did not conduct frequency calculations for the random match probabilities on the partial DNA profiles obtained on the driver's side interior door panel, on the driver's side interior door handle, or on the partial DNA profiles obtained on the vaginal and anal swabs. As to these partial profiles, Bolinger said only that Harding could not be eliminated as the source of the DNA found in these partial profiles.

■ DNA evidence, even without a showing of statistical significance, is admissible. *State v. Ferguson,* 20 S.W.3d 485, 495 (Mo. banc), *cert. denied,* 531 U.S. 1019, 121 S.Ct. 582, 148 L.Ed.2d 499 (2000). In *Ferguson,* the defendant claimed that the circuit court erred in admitting DNA evidence because the State presented no evidence of the statistical significance of its DNA test results and that the characterization of the DNA comparison as a "match" is meaningless. *Id.* Although the defendant conceded that he did not object to evidence and asked for plain error review, the *Ferguson* court found that it was not error—much less plain error—for the circuit court to admit DNA testimony without evidence of the statistical significance of the DNA test results. *Id.* The court said:

> Scientific evidence, such as hair, fiber, and blood type evidence, is often admitted where the only conclusion to be drawn is that the tested sample is consistent with the defendant's sample, or that defendant's sample shows that he cannot be excluded as the perpetrator. Therefore, it was not error, much less manifest injustice, to admit the testimony that [the defendant's] DNA "matched" that of the DNA extracted from the semen stain on [the victim's] coat.

*Id.*

Even though a full genetic profile was not obtained, the circuit court could rely on the partial profiles that left Harding as a possible source of the DNA along with the other evidence in determining guilt.[8] "The weight to be afforded this evidence was within the province of the [fact-finder] to decide." *State v. Rockett,* 87 S.W.3d

---

8. To state the corollary of Harding's position is to demonstrate the fallacy of it. If the evidence eliminated Harding as a source of the DNA sample, such evidence would cer-

tainly be relevant and admissible even without statistics regarding the percentage of the population.

398, 405 (Mo.App.2002) (holding that the jury could rely on DNA evidence that did not result in a positive identification of the defendant). Indeed, in *State v. Abdelmalik*, 273 S.W.3d 61, 64 (Mo.App.2008), this court said that, even though a full genetic profile may not be produced from the materials gathered, it is permissible for a fact-finder to give significant weight to the DNA evidence when the partial profiles generated from these samples do not eliminate the defendant as a possible source of the material.[9] The circuit court, therefore, did not err in allowing Bolinger to testify about the partial DNA profiles she developed in the case without conducting frequency calculations for the random match probabilities on the partial DNA profiles.

 In his second point on appeal, Harding contends that the evidence was insufficient to convict him of murder in the first degree. In particular, he points to this evidence to establish that the evidence was insufficient to sustain his conviction:

(1) McWilliams engaged in a violent struggle that ended in her death and sustained many wounds that bled profusely, but, within 36 hours of the offense, Harding had no injuries and the sweater that he wore on the night of the offense, which had not been cleaned, had no blood or other tissues or fluids that would have linked him to the offense;

(2) None of the tools in Harding's truck had blood or traces of body fluids on them that would have linked him to McWilliams' death;

(3) Times provided by witnesses who purportedly saw Harding's truck in the area, when considered together, rendered Harding's guilt of murder physically impossible, and

(4) All of the people who purportedly saw Harding's truck near the field where McWilliams' body was found had a motive to lie.

Harding, however, in focusing on the evidence and inferences that do not support his conviction, ignores the appropriate standard of review.

 In reviewing the sufficiency of the evidence, we deem all evidence favorable to the State to be true. *State v. Crawford*, 68 S.W.3d 406, 407 (Mo. banc 2002). We do not reweigh the evidence, and we disregard all evidence and inferences contrary to the verdict. *Id.* at 408. Our review is limited to determining whether or not the state presented sufficient evidence from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt. *Id.* Even when the State's case is based upon circumstantial evidence, we must accept as true all evidence tending to prove the defendant's guilt and accept all reasonable inferences supporting the verdict while disregarding all parts of the record contrary to the verdict. *State v. Shelton*, 78 S.W.3d 200, 204 (Mo.App.2002).

The evidence in this case was sufficient for a reasonable fact-finder to establish that Harding was guilty beyond a reasonable doubt of murder in the first degree. The evidence established that Harding and McWilliams were seen together inside and outside a bar in the early morning hours before McWilliams's dead body was discovered in a field. After the bar closed, Jeremy Dodd saw Harding and McWilliams standing next to Harding's truck with the driver's door open, and it appeared to Dodd that Harding and McWilliams were

---

9. Although not determinative, it is not lost on this court that the fact-finder in this case was a seasoned trial judge who could and did easily differentiate between the various categories of DNA evidence presented and assigned each such weight as he believed that evidence was entitled.

getting ready to get inside the truck. Not long after Harding left the bar, Harding's truck was seen parked on the wrong side of the road immediately next to the field where McWilliams's body would be discovered a few hours later. Two cans of Budweiser beer found in a cooler in the back of Harding's truck matched the lot number printed on a can found in the field near McWilliams's body.

Further, as previously discussed, several areas inside Harding's truck tested positive for the presence of blood. A DNA profile consistent with McWilliams's DNA was found on the steering wheel faceplate. Partial DNA profiles were developed from the blood stains on the driver's side interior door handle and the driver's side interior door panel, and neither Harding nor McWilliams could be eliminated as the source of the DNA found there. Moreover, a DNA profile consistent with Harding was found on the beer can discovered in the field near McWilliams's body.

Tests on McWilliams's vaginal swabs and rectal swabs tested positive for semen. DNA consistent with Harding's DNA profile was found in the major component of the sperm fraction of McWilliams's vaginal swab, and Harding could not be eliminated as the minor contributor on the non-sperm fraction of the vaginal swab. As to the sperm fraction from the rectal swab, Harding could not be eliminated as a source of the minor component.

Moreover, Harding told the police that McWilliams had never been in his truck and that he had never had sex with McWilliams. The DNA evidence establishes otherwise. Harding's denials evidence a consciousness of guilt that the court could consider in determining his guilt. *Perry*, 275 S.W.3d at 249; *State v. Blair*, 298 S.W.3d 38, 45 (Mo.App.2009).

Given all of this evidence, we find that the evidence was sufficient for a fact-finder to conclude that Harding was guilty of murder in the first degree beyond a reasonable doubt. We will not reweigh the evidence because such is contrary to our standard of review.

We, therefore, conclude that the circuit court did not err and abuse its discretion in overruling Harding's motion to exclude and strike the testimony and reports of the State's DNA analyst and in considering DNA evidence that lacked statistical analyses. The circuit court also did not err in overruling Harding's motion for judgment of acquittal at the close of all the evidence and in convicting him because the evidence was sufficient for the court to find Harding guilty of murder in the first degree. We affirm the circuit court's judgment.

All concur.