KEVIN RODRIGUEZ, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 56413

April 5, 2012

273 P.3d 845

*Susan D. Burke*, Las Vegas, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy Dis-

trict Attorney, and *Samuel G. Bateman*, Deputy District Attorney, Clark County, for Respondent.

Before DOUGLAS, HARDESTY and PARRAGUIRRE, JJ.

## OPINION

By the Court, HARDESTY, J.:

In this opinion, we focus on two issues. First, we consider authentication and other evidentiary challenges to the admissibility of text messages. In particular, we conclude that text messages are

subject to the same authentication requirements under NRS 52.015(1) as other documents, including proof of authorship. Here, we conclude that the district court abused its discretion in admitting 10 of the 12 text messages that the State claimed were sent by the appellant, a codefendant, or both using the victim's cell phone because the State failed to present sufficient evidence corroborating the appellant's identity as the person who sent the 10 text messages. However, we conclude that the error was harmless.

Second, we examine whether testimony that a defendant could not be excluded as the source of a discovered DNA sample is admissible in the absence of supporting statistical data reflecting the percentage of the population that could be excluded as the source of the discovered DNA sample. We hold that, so long as it is relevant, DNA nonexclusion evidence is admissible because any danger of unfair prejudice or of misleading the jury is substantially outweighed by the defendant's ability to cross-examine or offer expert witness evidence as to probative value. Here, we conclude that the district court did not abuse its discretion by admitting the relevant DNA nonexclusion evidence. Accordingly, we affirm the district court's judgment of conviction.

## FACTS AND PROCEDURAL HISTORY

On the night of May 12, 2008, a woman was attacked in her apartment by two men. One of the men warned the victim that they would ''blow [her] head off'' if she moved. The men then blindfolded the victim, and she heard them pulling the shoelaces out of her shoes. The men used the shoelaces to bind her arms and legs while she was lying on the floor on her stomach. The men questioned her about where she kept her money, and when the victim claimed not to have any, they again threatened to blow her head off.

While one of the men held her down, the victim could hear the other man rummaging through her kitchen. The victim then felt what she thought was one of the men poking her in the ribcage with a knife, and she also thought there was an object on the floor that felt like a gun. The victim finally confessed to the men that she kept her debit card in her car, and said she would give them the personal identification number (PIN).

The men carried the victim from the living room to the bedroom and threw her onto the bed. As one of the men began to sexually assault her, the second man obtained the debit card from the victim's car. The man who was assaulting the victim kept threatening to kill her if she resisted too much. After the sexual assault, the men threw the victim in the closet in her bedroom and threatened to come back and kill her if she gave them the incorrect PIN. Later, the victim escaped to a neighbor's apartment where she called the police. She was later taken to a hospital.

The victim's boyfriend came to the hospital and showed some text messages he had received earlier that night to the detective who accompanied the victim to the hospital. The victim's boyfriend had been texting with the victim earlier in the evening, and when she stopped responding he assumed she had fallen asleep. In the early morning hours of May 13, 2008, the victim's boyfriend started receiving the following text messages from the victim's phone:

- "Willy boy, you better [%00]."[1] (1:29 a.m.).
- "Willy, do you love me." (1:30 a.m.).
- "You better go check on your b----." (1:38 a.m.).
- "Not playing, not going to answer the phone. You better go check on that . . . b----, she is, you know." (1:42 a.m.).
- "You dumb ass idiot, you're not talking to her. You better go to her house now. I have to keep my promise and I'm not going back over there. I think you should." (1:47 a.m.).
- "You're an a-------. Come over . . . there or your girl is going to suffocate, idiot." (1:50 a.m.).
- "Yeah, you better go over there now. She is in the closet tied up." (1:53 a.m.).
- "I hope you is going over there." (2:00 a.m.).
- "We just f----- your b----." (2:02 a.m.).
- "I'm not going to tell me or you no more. She even told me she got herps." (2:05 a.m.).
- "How is your girl? Is she okay?" (3:08 a.m.).
- "You're lucky I didn't kill that b---- and I told you." (4:21 a.m.).

The victim's phone was recovered from the codefendant's cousin, who testified at trial that the codefendant asked him to take the phone when he and Rodriguez were arrested. The phone contained photos of Rodriguez, the codefendant, and the codefendant's girlfriend.

Other evidence linked Rodriguez and the codefendant to ATM withdrawals from the victim's bank account. The victim's debit card was used at an ATM on Las Vegas Boulevard at 12:43 a.m. on May 13, about five minutes before the victim called the police. The ATM was close in proximity to the victim's apartment. Less than ten minutes later, the card was used to withdraw about $500 in multiple transactions at another ATM. The card was also used at a third ATM. After viewing surveillance videos from the ATMs, a detective with the Las Vegas Metropolitan Police Department

---

[1]The victim's boyfriend described it as saying "Willy boy, you better percentage zero, zero," but he did not know what that meant.

(LVMPD) identified Rodriguez and codefendant Timothy Sanders as the men in the videos using the victim's debit card.

Rodriguez was further linked to the ATM transactions through DNA evidence. LVMPD forensic scientist Julie Marschner testified regarding various DNA samples obtained from items seized during the investigation. Among those items was a pair of sneakers identical to sneakers that Rodriguez was depicted wearing in the ATM surveillance videos. Marschner testified that she compared the DNA sample taken from the sneakers with DNA samples obtained from Rodriguez, the victim, Sanders, Sanders's cousin, and the victim's boyfriend. Marschner could not exclude Rodriguez as a contributor to the DNA sample taken from the sneakers. On cross-examination, defense counsel questioned Marschner about the DNA results related to the sneakers. When defense counsel asked Marschner if she was able to exclude any percentage of the population as the source of the DNA sample she tested, Marschner admitted that she did not calculate that statistical information for the sneakers. Defense counsel then objected to Marschner's testimony on the basis that it was "meaningless." The district court overruled the objection, finding that the evidence "goes to the weight of the admissibility. Also, . . . counsel indicated the records were timely turned over to defense counsel. Defense could have hired their own expert or ask[ed] that additional tests be run."

After a seven-day jury trial, Rodriguez was found guilty of multiple counts. Rodriguez now appeals his conviction.

## DISCUSSION

On appeal, Rodriguez argues that the district court erred in overruling his objection to the admission of 12 text messages because the State failed to authenticate the messages and the messages constituted inadmissible hearsay. He further argues that the district court erred in overruling his objection to the admission of DNA nonexclusion evidence because the evidence was irrelevant without supporting statistical data. Relying on NRS 48.035(1), Rodriguez argues that the probative value of the DNA evidence "was greatly outweighed by the danger of unfair prejudice and misleading the jury." He contends that Marschner's testimony on direct examination implied that Rodriguez was a contributor when, in reality, anyone could have been a contributor. We examine each issue in turn.

### Admissibility of a proffered text message[2]

Text messages offer new analytical challenges when courts consider their admissibility. However, those challenges do not require

---

[2]The term "text message" as used in this opinion refers to any short written message sent over a cellular network from one cell phone to another.

a deviation from basic evidentiary rules applied when determining authentication and hearsay. We take this opportunity to address several of those rules as they apply to text messages.

Rodriguez argues that the district court erred in admitting the 12 text messages because the State failed to authenticate the messages and they therefore are not relevant, and the messages are hearsay. We review the district court's decision on each challenge for an abuse of discretion. *Ramet v. State*, 125 Nev. 195, 198, 209 P.3d 268, 269 (2009).[3]

### *Authentication and identification*

Rodriguez first complains that the State did not sufficiently authenticate the text messages. In particular, he argues that the State did not establish that he sent the messages and therefore they were not admissible against him.

Only relevant evidence is admissible. NRS 48.025(2). NRS 48.015 defines ''relevant evidence'' as ''evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'' ''Authentication 'represent[s] a special aspect of relevancy,' . . . in that evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims.'' *U.S. v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992) (alteration in original) (citation omitted) (quoting Fed. R. Evid. 901(a) advisory committee's note). ''The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence or other showing sufficient to support a finding that the matter in question is what its proponent claims.'' NRS 52.015(1).[4] Because

---

[3]The State also argues that this court should deem the issue waived because Rodriguez did not object to the State's extensive discussion of the text messages during its opening argument. We conclude that this argument is without merit because Rodriguez did timely object when the text messages were being introduced as evidence. *Cf. Carter v. State*, 121 Nev. 759, 769, 121 P.3d 592, 599 (2005) (indicating that an objection to the admission of evidence is timely if made when the evidence is introduced for admission); *Layton v. State*, 87 Nev. 598, 600, 491 P.2d 45, 47 (1971). Furthermore, ''[o]pening statements of counsel . . . are not evidence of any character or of anything, and cannot be so considered by the jury.'' *State v. Olivieri*, 49 Nev. 75, 77-78, 236 P. 1100, 1101 (1925).

[4]Federal Rule of Evidence 901(a) is similarly worded to Nevada's authentication rule, NRS 52.015(1), and this court often views ''federal decisions involving the Federal Rules of Civil Procedure [as] persuasive authority when this court examines its rules.'' *Nelson v. Heer*, 121 Nev. 832, 834, 122 P.3d 1252, 1253 (2005).

the authentication inquiry is whether "the matter in question is what its proponent claims," the proponent of the evidence "can control what will be required to satisfy the authentication requirement" by "deciding what he offers it to prove." 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 7104, at 31 (1st ed. 2000) (internal quotation marks omitted). The question then is what is necessary to authenticate a text message.

Although this presents a question of first impression for this court, other courts have addressed the authentication of text messages, and we turn to their decisions for guidance. For example, the Superior Court of Pennsylvania considered the authentication of text messages where a detective testified to how he transcribed the text messages and that the transcription was an accurate reproduction of the text messages on the defendant's phone, but the prosecution conceded that the defendant did not author all of the text messages on her phone. *Commonwealth v. Koch*, 39 A.3d 996, 1005 (Pa. Super. Ct. 2011). The court observed that, as with non-electronic documents generally, the identity of the sender is critical to authenticating text messages, *see id.* at 1004-05, and that "the difficulty that frequently arises in . . . text message cases is establishing authorship," *id.* at 1004. The court reasoned that a person cannot be identified as the author of a text message based solely on evidence that the message was sent from a cellular phone bearing the telephone number assigned to that person because "cellular telephones are not always exclusively used by the person to whom the phone number is assigned." *Id.* at 1005. Thus, some additional evidence, "which tends to corroborate the identity of the sender, is required." *Id.* Circumstantial evidence corroborating the sender's identity may include the context or content of the messages themselves, *id.* at 1004-05, such as where the messages "contain[ ] factual information or references unique to the parties involved," *id.* at 1004. Other jurisdictions similarly have focused on the sender's identity and looked to the context and content of the text messages for sufficient circumstantial evidence identifying the sender. *See, e.g., Dickens v. State*, 927 A.2d 32, 36-37 (Md. Ct. Spec. App. 2007) (identifying details in text messages that could have been known by only a small number of persons, including defendant, defendant's conduct after the messages were sent, and nickname used in one message as circumstantial evidence sufficient to link defendant to the messages); *State v. Taylor*, 632 S.E.2d 218, 230-31 (N.C. Ct. App. 2006) (pointing to information in the message and that sender identified himself twice using the victim's first name as sufficient circumstantial evidence that the victim sent the messages).

As the reasoning of these jurisdictions illustrates, establishing the identity of the author of a text message through the use of corroborating evidence is critical to satisfying the authentication requirement for admissibility. We thus conclude that, when there has been an objection to admissibility of a text message, *see* NRS 47.040(1)(a), the proponent of the evidence must explain the purpose for which the text message is being offered and provide sufficient direct or circumstantial corroborating evidence of authorship in order to authenticate the text message as a condition precedent to its admission, *see* NRS 52.015(1); *see also* NRS 47.060; NRS 47.070.[5]

Here, the State offered the text messages to prove that Rodriguez was one of the men who assaulted the victim. As such, the messages were only relevant to the extent that the State could authenticate them as being authored by Rodriguez. The State established that the victim's cell phone was stolen during the attack. The victim's boyfriend testified that he received the 12 text messages on his cell phone from the telephone number assigned to the victim's cell phone, and the State showed that the victim's boyfriend began receiving those messages shortly after the assault. The State also presented evidence indicating that Rodriguez and Sanders were in possession of the victim's cell phone prior to their arrests. When the victim's phone was recovered by the police, it contained the 12 text messages, as well as photographs of Rodriguez that were taken after the phone was stolen. Although the State provided sufficient evidence that the text messages offered into evidence were sent from the victim's cell phone to her boyfriend's cell phone during a time when Rodriguez and Sanders had access to the victim's cell phone, the State only provided sufficient evidence to show that Rodriguez participated in authoring 2 of the 12 proffered text messages—the text message sent at 1:29 a.m. stating, "Willy boy, you better [%00]" and the text message sent at 1:30 a.m. stating, "Willy, do you love me." Those two text

---

[5]We note that once a text message is admitted into evidence, the opponent may rebut its authentication, and it is for the jury to decide whether the proponent sufficiently proved his or her claims regarding the text message. *See* NRS 52.015(3) ("Every authentication or identification is rebuttable by evidence or other showing sufficient to support a contrary finding."); *United States v. Branch*, 970 F.2d 1368, 1370-71 (4th Cir. 1992) ("Before admitting evidence for consideration by the jury, the district court must determine whether its proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic. . . . Although the district court is charged with making this preliminary determination, because authentication is essentially a question of conditional relevancy, the jury ultimately resolves whether evidence admitted for its consideration is that which the proponent claims." (citations omitted)).

messages were sent while Rodriguez and Sanders were on a bus together following the assault. The bus's surveillance video demonstrates that, with Rodriguez seated next to him and watching, Sanders held and operated the victim's cell phone. While it does not appear that Rodriguez typed the two text messages, he had firsthand knowledge of the messages and appeared to be participating in composing the messages. Based on this, we conclude that the State provided sufficient direct and circumstantial evidence that tends to corroborate that the two text messages sent at 1:29 a.m. and at 1:30 a.m. were what the State claimed them to be—messages sent or endorsed by Rodriguez that connect him to the assault. However, the record is devoid of any evidence that Rodriguez authored or participated in authoring the ten text messages that were sent after he and Sanders exited the bus around 1:36 a.m. In fact, the evidence suggests that it was Sanders, not Rodriguez, who had possession of the cell phone before they were arrested. Because those ten text messages were not sufficiently authenticated, we conclude that the district court abused its discretion in admitting them.

Notwithstanding the district court's improper admission of the ten remaining text messages against Rodriguez, we conclude that the error was harmless. *See Tavares v. State*, 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (''The test . . . is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' '' (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))). There was other overwhelming evidence to support the jury's verdict: the victim's testimony that the men who assaulted and robbed her took her debit card and her cell phone; the ATM surveillance videos depicting Rodriguez and Sanders using the victim's debit card at three separate locations, all in close proximity to the victim's apartment shortly after she was attacked; the bus surveillance video showing Rodriguez and Sanders using the stolen cell phone; and pictures of Rodriguez on the victim's phone taken after it was stolen from her apartment.

### Hearsay

We next address Rodriguez's hearsay objection to the text messages. As a general rule, hearsay is inadmissible. NRS 51.065. Nevada generally defines ''[h]earsay'' in NRS 51.035 as ''a statement offered in evidence to prove the truth of the matter asserted.'' NRS 51.035 also excludes certain statements from that definition, such as a statement offered against a party ''of which [that] party has manifested adoption or belief in its truth,'' NRS 51.035(3)(b).

We conclude that the two text messages that were authenticated are not hearsay pursuant to NRS 51.035(3)(b).[6]

*Admissibility of DNA nonexclusion evidence*

Relying on NRS 48.015 and NRS 48.035(1), Rodriguez argues that the district court committed error by admitting testimony that he could not be excluded as the source of the DNA obtained from the sneakers absent testimony explaining the statistical relevance of the nonexclusion result, such as the percentage of the population that could be excluded. According to Rodriguez, the DNA nonexclusion evidence is either irrelevant or had limited probative value but a significant risk of unfair prejudice or misleading the jury without the additional statistical analysis to provide context. We disagree.

DNA nonexclusion results are derived from a comparison of a discovered DNA sample and a known DNA sample. *See Sholler v. Com.*, 969 S.W.2d 706, 709 (Ky. 1998). The results of DNA analysis may demonstrate that the source of the known sample, while not conclusively determined to be the source of the discovered DNA sample, cannot be eliminated as the source of that sample. *Id.*

As noted above, this court "review[s] a district court's decision to admit or exclude evidence for an abuse of discretion." *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008). In resolving whether nonexclusion DNA results are admissible in the absence of supporting statistical data reflecting the percentage of the population that could be excluded, we examine as instructive authority the approach other jurisdictions have taken on this issue.

For example, in *State v. Harding*, the defendant challenged the trial court's decision to admit testimony regarding DNA evidence. 323 S.W.3d 810, 816 (Mo. Ct. App. 2010). The defendant argued that the DNA evidence, which indicated that he was a possible source of the tested DNA samples, was irrelevant and thus inadmissible because the DNA analyst failed to support her conclusion by conducting certain calculations "for the random match probabilities" on some of the DNA samples. *Id.* at 816-17. The DNA analyst simply testified that the defendant "could not be eliminated as the source of the DNA found." *Id.* at 817. The court concluded that "DNA evidence, even without a showing of statistical significance, is admissible," and that it is the fact-finder's duty to weigh

---

[6]In a conclusory sentence, Rodriguez suggests that the admission of the text messages raises a confrontation issue. We disagree. The text messages were neither hearsay nor testimonial. *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

this evidence together with all other evidence presented when determining guilt. *Id.* The court went on to note the fallacy of the defendant's argument—if the DNA evidence eliminated the defendant as the source, "such evidence would certainly be relevant and admissible even without statistics regarding the percentage of the population." *Id.* at 817 n.8.

Similarly, in *Sholler*, 969 S.W.2d at 709, the appellant challenged the admission of DNA evidence because it was unsupported by statistical analysis. The witness testified that her testing of the DNA samples "matched" DNA samples taken from the appellant; however, a match simply meant that the witness could not exclude the appellant as a possible source, not that he was the source, of the tested DNA samples. *Id.* The court held that the DNA evidence was admissible because it was "both relevant and assisted the jury in determining whether [a]ppellant could have been the perpetrator of the[ ] crimes." *Id.* at 710. Furthermore, the court reasoned that questions as to the accuracy of the DNA test results are matters of weight for the jury. *Id.* It noted that "[i]f [a]ppellant desired additional evidence of statistical probabilities based on [the DNA] test results, he could have hired his own population geneticist to analyze the results and testify to those probabilities." *Id.*

Finally, in *People v. Schouenborg*, 840 N.Y.S.2d 807, 808 (App. Div. 2007), the court held that statistical analysis was not required in order to admit DNA evidence because the DNA expert testified that she could not exclude the defendant as a contributor to the DNA sample she tested, not that the defendant matched the tested DNA sample.

In keeping with the holdings from these other jurisdictions, we conclude that DNA nonexclusion evidence is admissible in the absence of supporting statistical data reflecting the percentage of the population that could be excluded as long as the nonexclusion evidence is relevant, because any danger of unfair prejudice or of misleading the jury is substantially outweighed by the defendant's ability to cross-examine or offer expert witness evidence as to probative value. *See* NRS 48.015; NRS 48.035(1).

Here, Marschner testified that Rodriguez could not be excluded as a contributor to the DNA sample from the sneakers, not that he was the source of the DNA sample. Additionally, defense counsel competently cross-examined Marschner regarding the tests she conducted on the DNA evidence. We determine that the DNA evidence was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice or of misleading the jury. It was for the jury to decide the amount of weight to be given to this evidence. Furthermore, as the district court correctly found, Rodriguez had ample opportunity to rebut this evidence through his

own DNA expert testimony or by conducting his own testing of the DNA samples. Thus, we conclude that the district court did not abuse its discretion by admitting the DNA nonexclusion evidence.[7]

For the above reasons, we affirm the judgment of conviction.[8]

DOUGLAS and PARRAGUIRRE, JJ., concur.

---

[7]Rodriguez also appears to challenge the admissibility of Marschner's testimony regarding the DNA nonexclusion evidence related to the victim's cell phone. However, Rodriguez admits in his opening brief that he only objected during trial to the DNA nonexclusion evidence concerning the sneakers. "When an error has not been preserved, this court employs plain-error review. Under that standard, an error that is plain from a review of the record does not require reversal unless the defendant demonstrates that the error affected his or her substantial rights, by causing 'actual prejudice or a miscarriage of justice.' " *Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (footnote omitted) (quoting *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)); *see also Pantano v. State*, 122 Nev. 782, 795, 138 P.3d 477, 485 (2006). Because Rodriguez has failed to demonstrate how his substantial rights were affected, and because we conclude that the district court did not err in admitting the DNA nonexclusion evidence related to the sneakers, we also conclude that the district court did not commit plain error by admitting the DNA nonexclusion evidence related to the victim's cell phone.

[8]Rodriguez also argues that cumulative error warrants reversal, that the State committed prosecutorial misconduct by making an improper statement to the jury, and that the district court erred by giving certain jury instructions and failing to give others. We conclude that these arguments are without merit and require no further discussion.