[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14241
_____

D.C. Docket No. 2:16-cr-00542-LSC-SRW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DARRIUS MARCEL MASTIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(August 26, 2020)

Before WILLIAM PRYOR, Chief Judge, GRANT, Circuit Judge, and ANTOON[*],
District Judge.

GRANT, Circuit Judge:

_____

[*] Honorable John Antoon II, United States District Judge for the Middle District of
Florida, sitting by designation.

Darrius Mastin was convicted of being a felon in possession of a firearm. The gun was detected when a fugitive task force executed two arrest warrants at a hotel room in Montgomery, Alabama. Mastin was not the subject of either warrant—but he was inside the hotel room when members of the task force arrived. Unfortunately for him, a gun fell from his waistband as he complied with a police order to get on the ground and crawl out of the room. The officers secured the weapon, and Mastin was promptly detained.

Mastin now appeals his conviction. He first suggests that the police violated the Fourth Amendment by executing the arrest warrants at the hotel room without sufficient certainty that the subjects of the warrants were present. He next argues that it was not reasonable under the Fourth Amendment for the police to order him to get down on the ground and crawl out of the room. Finally, he claims that the district court abused its discretion and violated his Sixth Amendment rights by excluding certain topics from the scope of cross-examination of law enforcement witnesses. We affirm his conviction.

I.

The events leading to Mastin's conviction arose after a fugitive task force received felony arrest warrants for two gang members named Trudyo Hines and Taboris Mock. Those warrants concerned a robbery committed with handguns—though the men were also wanted for questioning about a related homicide. Officers learned that the two men were likely staying at hotels in Montgomery, Alabama. In the officers' experience, fugitives would often register hotel rooms under the names of relatives or girlfriends to avoid apprehension. Their experience

prompted an investigation into local hotels, which revealed that Nakita Rogers, Hines's girlfriend, had checked into a Country Inn and Suites with at least one other person.[1]  The officers confirmed Rogers's room number and surveilled the hotel.

Shortly after midnight, several vehicles pulled into the parking lot.  Three men—two of whom matched the descriptions of Hines and Mock—and three women exited the vehicles and went into the hotel.  The officers confirmed with the front desk in real time that one of the women was Nakita Rogers.  A short time later, two men and one woman exited the hotel and left in one of the vehicles.

Because the officers did not know whether Hines and Mock were still in the hotel, were in the vehicle that had just departed, or had split up, they broke up into two teams.  One team planned to conduct a traffic stop on the vehicle, while the other planned to make contact at the hotel room (with the goal of keeping either half of the group from alerting the other).

When the team at the hotel arrived on the correct floor, the door to the targeted room was slightly ajar.  As the team set up, the door swung open; a man stood inside the doorway with his hands in the pocket of his hoodie.  The officers immediately recognized that the man was neither Hines nor Mock.  The officers also recognized Nakita Rogers standing behind the man in the doorway with at least one other female in the room.  The officers ordered the man—who they eventually learned was Mastin—to take his hands out of his pockets.  Next, they

---

[1] While the trial transcript lists the girlfriend's first name as Nikita, we follow other references in the record and in Mastin's briefing and use Nakita.

told the room's occupants to get on their knees with their hands up, and then to crawl out into the hallway one by one.

Mastin went first. As he crossed the threshold of the door, a 9mm pistol fell out of his waistband. In response, one of the officers pulled the weapon out of Mastin's reach. The officers detained him and repeated the order for the women to exit the room. Once everyone was out, the officers entered the room to ensure that no one else remained hiding inside. While conducting their sweep, the officers saw a total of three handguns in in the room, all in plain view. Checking the identity of the room's occupants against computer records revealed that Mastin was on probation following a robbery conviction.

Meanwhile, as the first team attempted to execute the arrest warrants at the hotel, the second team conducted the planned traffic stop. Hines was in the vehicle and the officers arrested him. Mock was nowhere to be found at that point; he was arrested later that night at a different hotel room rented in his girlfriend's name.

Mastin was indicted on one count of possessing a firearm as a felon. He pleaded not guilty and moved to suppress the firearm. In support of his motion, he argued that the search of the hotel room was unlawful in the absence of a warrant and that his weapon was found in violation of the Fourth Amendment.

In a Report & Recommendation that followed an evidentiary hearing, a magistrate judge recommended denying the motion to suppress. The magistrate concluded that, although the officers did not have articulable suspicion to justify a stop of Mastin under the *Terry* line of cases, the officers did have reason to believe that the hotel was the dwelling of Hines or Mock, and that at least one of the men

was likely present.  The magistrate therefore concluded that the officers were entitled to enter the room and attempt to execute the warrant under *Payton v. New York*, which recognized officers' "limited authority" to enter a home to execute an arrest warrant.  445 U.S. 573, 603 (1980).  The district court accepted the recommendation over Mastin's objection.

After the suppression hearing, the government filed a motion in limine to prevent Mastin from relitigating issues relating to the suppression at trial.  Specifically, the government sought to prevent Mastin from suggesting that the United States violated his constitutional rights when they detained him.  The government argued that Mastin's only purpose for offering such evidence would be to cast doubt on the legality of the seizure—a decision reserved for, and already decided by, the district court.  Mastin objected, arguing that the limitations would prejudice his right to a fair trial.  At a hearing addressing the motion in limine, Mastin explained that his theory of the case was that the officers were lying—that they did not actually ask him to go to the hallway, but instead burst into the room because they were looking for additional evidence.  He argued that he should be allowed to cross-examine the officers on a few related topics: whether or not they had a search warrant, the exact kind of equipment they had with them (which included a battering ram and a shield), and whether it would have been logistically feasible to arrest Mock and Hines outside of the hotel.  He argued that these questions directly challenged the credibility of the officers.

The district court broadly ruled that Mastin was not permitted to continue raising arguments about the legality of the seizure.  To back up that ruling, the

5

court prohibited questioning the officers about the equipment they carried, whether they had a search warrant, what other firearms they recovered from the room, and whether Nakita and the other woman in the room had pistol permits.  The court did give Mastin some leeway, ruling that he could ask the officers about the general sequence of events, their purpose for being at the hotel, what they did when they got to the door of the room, whether they burst into the room, and where they found the gun.  The court also explained that it would not prevent Mastin from impeaching the testimony of the officers, and that Mastin could approach the bench during trial if he felt that the officers said something that would open the door to one of the prohibited subjects.  Mastin repeated his objections throughout the trial, but the court overruled him each time.

Mastin was convicted of being a felon in possession of a firearm.  He now appeals.

## II.

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts *de novo*."  *United States v. Magluta*, 44 F.3d 1530, 1536 (11th Cir. 1995).  "Our review is not moored to the evidence presented at the suppression hearing; we are free to look at the whole record."  *United States v. Campbell*, No. 16-10128, 2020 WL 4726652, at *5 (11th Cir. Aug. 14, 2020).  We review "limitations on the scope of cross-examination for 'a clear abuse of discretion.'"  *United States v. Rushin*, 844 F.3d 933, 938 (11th Cir. 2016) (quoting *United States v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009)).  However, we

review de novo a defendant's claim that the government violated his Sixth Amendment rights.  *See id.*

### III.

### A.

We first consider whether the officers were authorized to enter the hotel room while attempting to execute the arrest warrant.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A hotel room—though not what ordinarily comes to mind when one pictures a "house"—qualifies as a place in which the people remain "secure" against unreasonable searches and seizures.  "No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures."  *Stoner v. California*, 376 U.S. 483, 490 (1964) (internal citation omitted); *see also United States v. Forker*, 928 F.2d 365, 370 (11th Cir. 1991) ("[A] person does not forfeit fourth amendment protections merely because he is residing in a motel room.").

That means we need to decide whether the officers were entitled to enter the hotel room in their attempt to arrest Mock or Hines.  The short answer is yes.  An "arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000) (quoting *Payton*, 445 U.S. at 603).  So entering a home to carry out an arrest warrant is reasonable under the Fourth Amendment if the officer has a

7

reasonable belief both "that the location to be searched is the suspect's dwelling" and "that the suspect is within the residence at the time of entry." *Id.* (quoting *Magluta*, 44 F.3d at 1535).

When determining whether an officer reasonably held those two beliefs, we consider the totality of the circumstances—including "common sense factors." *Id.* (citing *Magluta*, 44 F.3d at 1535). A college student, for instance, might fairly be assumed to reside at his parent's address when school is not in session. *See id.* And an officer's mistaken belief that a suspect resided at a dwelling or was there at a particular time does not necessarily render a search unreasonable or prevent the admission of evidence obtained while attempting to arrest the suspect at that location—so long as the officer's belief was reasonable in the first place. *See id.* at 1262–69.

The facts here offer plenty of support for the officers' testimony that they believed the hotel room was either Mock's or Hines's dwelling at the time of entry. They believed the two men were "running together" because of an ongoing dispute with another gang. Neither man was likely to rent a hotel room in his own name— they were wanted for armed robbery, as well as for questioning about a homicide, and would make light work for the officers seeking to arrest them if they revealed their whereabouts by renting a hotel room. But the fugitive task force knew that Rogers—Hines's girlfriend—had rented a room under her name. And they knew that she had rented that room with another individual present. It was not a leap for the task force to believe that she likely rented the room on behalf of Hines.

8

The facts also show that law enforcement reasonably believed that Hines or Mock was inside the hotel room.  After surveilling the premises, the task force knew that six other individuals, including two that matched Hines's and Mock's description, had entered the hotel.  Of course, some of those individuals later left the hotel—which is exactly why the task force split into two teams.  But the team that remained at the hotel did so under the reasonable belief that either Hines or Mock had remained behind.

The fact that the officers could not be completely certain does not change that calculus.  Consider the result under an alternative rule; it would be a pretty neat trick if two fugitives, along with a few other friends, could split up into two hotel rooms such that police could not be absolutely certain which one they were in.  And contrary to Mastin's contention, the fact that the police knew that *he* was not Hines or Mock did not remove their ability to enter the hotel room.  After all, the "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and it was hardly unreasonable for the police to ensure that neither of their arrest targets were in the room.  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  Because the officers reasonably believed that the hotel room was the dwelling of Hines, Mock, or both, and that at least one of them was inside, they did not violate the Fourth Amendment by entering the hotel room to execute the arrest warrants.[2]

---

[2] The district court also held that Mastin failed to demonstrate a reasonable expectation of privacy in the hotel room.  Because Fourth Amendment standing is not a jurisdictional issue, we decline to reach this additional reason to uphold the officers' entry.  *See United States v. Ross*, 963 F.3d 1056, 1061–62 (11th Cir. 2020) (en banc).

B.

Mastin's fallback point is that, even if executing the warrant at the hotel room was proper, his seizure was unreasonable. In particular, he argues that requiring him, an innocent bystander who was not sought by police, to crawl out of the hotel room was unreasonable and violated the Fourth Amendment. That argument, however, runs headlong into more than one precedent, and those precedents logically extend to cover this case.

For starters, it has long been understood that police can detain the occupants of a dwelling while they execute a search warrant. In *Michigan v. Summers*, the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981) (footnote omitted). And that rule applies to bystanders as well as to the subject of the investigation. In other words, officers can briefly detain anyone within a dwelling while they execute a search warrant there.

The primary rationale for the *Summers* rule is not hard to figure out. Safety is paramount—for both officers and bystanders. Detaining third parties during the execution of a search warrant is reasonable because of the potential risk if bystanders could *not* be detained. *See id.* at 702–03. The Court explained that, even in the absence of evidence suggesting a "special danger to the police," executing the warrant "may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702. So the rule the Court set out did not rely on particular evidence of special danger because "[t]he risk of harm to both the

10

police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 702–03.

The *Summers* case, of course, was about search warrants, and this case is about arrest warrants. But the *Summers* rationale applies equally in both scenarios. We have come close to saying so, explaining that *Summers* stands for the proposition that "a police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing." *Hudson v. Hall*, 231 F.3d 1289, 1297 (11th Cir. 2000). We now explicitly extend the *Summers* rule to cover arrest warrants as well as search warrants: officers may briefly detain those on the premises while they seek to execute an arrest warrant.[3]

Any contrary rule would directly undermine the reasoning in *Summers*, as the facts of this case well illustrate: the task force officers were hunting violent felons who were known to be armed and who may have been implicated in a homicide. If the officers were not allowed to briefly detain Mastin, and were instead required—as Mastin argues—to simply ask him to "show his hands or to

---

[3] The other circuits that have opined on this issue have reached differing conclusions. For example, the Sixth Circuit has declared that "the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant." *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003). The Ninth Circuit, by contrast, has declined "to extend the categorical *Summers* rule to arrest warrants." *Sharp v. County of Orange*, 871 F.3d 901, 915 (9th Cir. 2017). The Ninth Circuit appeared to refuse to extend *Summers*, however, in part because of its belief that the *Summers* rule would preclude "a fact-bound inquiry" inquiry into the method of detention. *See id.* (discussing *United States v. Enslin*, 327 F.3d 788 (9th Cir. 2003)). Not so; even where categorically authorized to detain a bystander, the police might still violate the Fourth Amendment via their method of detention. The Supreme Court engaged in that exact analysis in *Muehler v. Mena*, first holding that *Summers* authorized a detention, then evaluating the use of handcuffs to "effectuate" that detention. 544 U.S. 93, 99 (2005).

step aside," then the officers would be required to expose themselves to an unacceptable degree of risk. And that risk would extend to the other occupants of the room, who could have been caught in the crossfire if violence broke out.

Mastin, after all, was concealing a firearm in his waistband—and that only became apparent to the officers after Mastin was forced to crawl on the ground. If he had been a criminal associate of Hines and Mock whom the officers could only ask to "step aside," then the police would have searched the room for two armed robbery suspects while one of their armed associates stood directly behind or alongside them. The absurdity of a rule requiring that outcome is apparent.

Our extension of the *Summers* rule to cover the execution of arrest warrants is also consistent with the decision in *Maryland v. Buie*, where the Supreme Court held that law enforcement may conduct a "protective sweep" of a residence when executing an in-home arrest if officers have a reasonable belief the protective sweep is necessary for their safety. 494 U.S. 325, 336–37 (1990). That rule would be worthless if the officers, upon finding someone hiding in a closet, were forbidden from making a brief, reasonable detention simply because the person was not a subject of the arrest warrant.

Of course, just because officers are entitled to detain bystanders while executing warrants does not mean that any manner of detention will always be reasonable. Even if "lawful at its inception," a seizure "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). But here the district court correctly concluded that the seizure of Mastin was reasonable. The

12

arrest warrants in question were for violent crimes, and the suspects were alleged to be armed gang members. Requiring Mastin to lower himself to the ground allowed officers to peer over him and look for any emerging threats from the room (say, a gunman popping out of a closet). And the Constitution does not require us to argue with the sound police practice of requiring potentially dangerous individuals to come out of areas that the police do not control (such as the hotel room) and into areas that police do control (such as the hallway). *Summers* applies to the execution of arrest warrants, and Mastin's Fourth Amendment rights were not violated.

## C.

Mastin's last argument is that he was deprived of his Sixth Amendment right to a fair trial because the district court improperly limited his right to cross-examine the police witnesses and develop his preferred defense theory: that the officers found a gun after they entered the hotel room and then concocted the story that it fell out of his waistband. He argues that he should have been allowed, under the Confrontation Clause, to cross-examine the prosecution's main witness on topics such as whether law enforcement obtained a search warrant and which kind of equipment the task force brought to the hotel room, arguing that the answers to those questions would either reveal the witness's "biases, prejudices or ulterior motives" or undermine the witness's "truthfulness" about "what exactly occurred

at the hotel." His challenge fails because the district court's actions were well within its ordinary discretion to manage the trial.

To be sure, that discretion has its boundaries. The right to question one's accusers, as set out in the Confrontation Clause, is one of them. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. So the district court's ordinary discretion "to rule on the admissibility of evidence, including the power to limit cross-examination" is tempered by "the guarantee of the Sixth Amendment's Confrontation Clause that a criminal defendant has the right to cross-examine prosecutorial witnesses." *Maxwell*, 579 F.3d at 1295 (citation and internal quotation marks omitted). Cross-examination, after all, "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Still, the right to cross-examine "is not unlimited." *United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994). Once the Confrontation Clause has been satisfied by sufficient examination, "further questioning is within the district court's discretion." *Id.* And when considering whether the Confrontation Clause has been satisfied, for these purposes at least, the jury's ability to assess the credibility of the witness is the decisive factor. The question "is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Id.* at 1469.

Mastin has not met that standard. We have held that "the district court enjoys wide latitude to impose reasonable limits on cross-examination based on,

14

among other things, confusion of the issues." *Maxwell*, 579 F.3d at 1296 (citation and quotation marks omitted).  Here, the questions Mastin wished to pursue were "merely cumulative or of dubious relevance." *United States v. Leavitt*, 878 F.2d 1329, 1340 (11th Cir. 1989).  Questions such as whether the officers had a search warrant would have had little bearing on the main testifying officer's credibility or supposed "biases, prejudices or ulterior motives."  Instead, that question would have suggested that the officers had no authority to enter the hotel room—an issue of law that the district court had already decided against Mastin.  And Mastin has failed to show how, say, questions regarding the precise equipment the officers carried, would bear on the credibility or potential bias of the officers at all, much less how the answers to those questions would impair the credibility of the officer to such a degree that his testimony would be in doubt.  Nor has Mastin shown how his proposed questions would substantially undermine the truthfulness of the witness's narrative.  Instead, they would have tended—as the district court noted— to confuse the issues before the jury.

The same goes for Mastin's proposed questions about whether other firearms were in the room and whether the two women present had pistol permits. Relevance is not obvious; whether other guns were in the room and whether other people were permitted to have those guns has little or nothing to do with whether Mastin possessed a gun.  But even setting that aside, Mastin's claim fails.  We cannot see how hearing either of these (factually true) points from the officer

15

himself would have damaged his credibility with the jury or otherwise revealed "biases, prejudices or ulterior motives."

The district court therefore did not violate Mastin's Sixth Amendment right to confront the witnesses against him. The questions he wished to ask would not have been probative of any bias or lack of truthfulness; they would have confused the issues. And for the same reasons, the district court did not otherwise abuse its discretion by restricting cross-examination on these topics.

\*    \*    \*

Having found no error in the district court's rulings either at the suppression hearing or at trial, we uphold Mastin's conviction.

**AFFIRMED.**