138 Nev., Advance Opinion 44

# IN THE SUPREME COURT OF THE STATE OF NEVADA

LARRY DECORLEON BROWN,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 81962



FILED

JUN 23 2022

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a second amended judgment of conviction, pursuant to a jury verdict, of conspiracy to commit robbery, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon, and pursuant to an *Alford* plea, of ownership or possession of a firearm by a prohibited person. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed.*

JoNell Thomas, Special Public Defender, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Karen L. Mishler, Chief Deputy District Attorney, Clark County,
for Respondent.

BEFORE THE SUPREME COURT, SILVER, CADISH, and PICKERING, JJ.

SUPREME COURT
OF
NEVADA

(O) 1947A

22-19853

## OPINION

By the Court, SILVER, J.:

In this appeal from a judgment of conviction, we consider whether a jury may consider footwear impression evidence without the aid of expert testimony and conclude that such was proper here. We also consider whether the district court violated the defendant's rights under the Confrontation Clause by allowing a witness to testify via two-way video and limiting that witness's testimony to avoid disclosing trade secrets. Although the district court failed to make express findings under *Lipsitz v. State*, 135 Nev. 131, 442 P.3d 138 (2019), regarding the propriety of the two-way video, we determine reversal is not warranted here. We also conclude that the district court did not abuse its discretion by limiting the witness's testimony, and we affirm.

### FACTS AND PROCEDURAL HISTORY

The State indicted appellant Larry Brown on charges of conspiracy to commit robbery, robbery with the use of a deadly weapon, murder with the use of a deadly weapon, and ownership or possession of a firearm by a prohibited person. Brown entered an *Alford*[1] plea as to the possession charge but proceeded to trial on the remaining charges. These charges arose from the 2017 death of Kwame Banks, who was shot and killed outside a Las Vegas apartment complex. Responding officers found Banks's body lying between two cars in a pool of blood. Two bullet cartridge cases were nearby, and bloody shoe prints led away from the body. A torn latex glove was near the body, and the remainder of that glove was near the apartment complex exit. A separate black glove was lying in front of some

---

[1]*North Carolina v. Alford*, 400 U.S. 25 (1970).

 

parked cars near the body. Officers also discovered three cell phones in the vicinity: one under Banks's body, one a few feet away in some landscaping rocks, and one near the exit. Banks's pockets appeared to have been searched, but Banks still had about $1,900 in cash, earrings, and a bracelet on his person.

Detectives learned that before his death Banks agreed to sell marijuana to Anthony Carter, Brown's codefendant, and to an unidentified third party. Banks drove a car to an apartment complex to do the sale. The detectives found Banks's car the next day, approximately a half mile from the crime scene, burned and missing its license plates. Detectives also learned that a patrol officer had come upon the car the night of the murder and observed a white mid-sized SUV pick up an African-American male and drive off. Detectives were able to obtain video surveillance showing the white SUV, which the State presented to the jury.

Police investigated the three cell phones and determined that two belonged to Banks and the third was registered to Brown under an Atlanta, Georgia, address and phone number. Following the murder, police executed a search warrant for Brown's home and found a white SUV and shoes that had prints which appeared to match the shoeprints at the crime scene.[2] Brown was later located in Atlanta, where he was arrested following a brief chase. Detectives thereafter linked the DNA on both the torn latex glove found near the body and the black cloth glove to Brown, but the murder weapon was never recovered.

Detectives used technology from a private company called Cellebrite to extract information from Banks's phones, but they were unable

---

[2]One of the shoes had a reddish-brown stain, but it tested negative for blood.

to access the contents of Brown's phone. Police then sent Brown's phone to Cellebrite, which initially was also unable to extract the data. Following a Cellebrite software update and pursuant to a second search warrant, police again sent the phone to Cellebrite, which this time successfully extracted the data. The employee who performed the successful extraction was Brian Stofik.

Notably, the extracted information contained a series of text messages between Carter and Brown in the days leading up to the murder, indicating they were planning to meet to do something involving an unidentified third person. Those messages included the address where the murder occurred and statements such as, "He have money in middle console 2 sum time mostly on him and in trunk in bags if he riding heavy he keep small pocket nife on right side," and, "If u need Nard he on stand by," as well as messages sent shortly before the murder such as, "Tonight the Night my brother," "Just seen you text okkk COOL!!!!," "How are we looking," "He suppose to be Pullen up my man that want the bags not here either . . . I told him be here at 9:30," and, "On standby."

Before trial, Brown moved to strike evidence of footwear impressions, arguing that such evidence required expert testimony. The State countered that it did not intend to present an expert because one was not needed as the photograph of the crime scene—showing the shoeprint and the photograph of the shoes found at Brown's residence later impounded into evidence—were independently admissible. The district court agreed and denied the motion. Brown also moved to preclude all cell phone information obtained from Cellebrite. Brown asserted that he should be able to cross-examine Cellebrite about its proprietary software that allows Cellebrite to duplicate the phone's data without actually reviewing

SUPREME COURT
OF
NEVADA

(O) 1947A

4

the information on it, as well as Cellebrite's processes for ensuring no information is changed during the extraction and return processes. At Brown's request, the district court agreed to have a sealed hearing outside the jury's presence to allow Brown to question Cellebrite's witness prior to his testimony at trial.

Early during trial, the State learned that it would be unable to reschedule Cellebrite employee Brian Stofik's testimony as necessary to have Stofik appear in person. Noting that Stofik would be testifying to whether the copy of the phone returned to law enforcement was accurate, the State argued that good cause existed to allow Stofik to testify audiovisually because Cellebrite had an employee shortage at the time of trial, rescheduling Stofik's testimony so that he could testify in person would cost an extra $10,000 to the State, and Stofik's testimony could be taken over two-way video. Brown made a *Crawford*[3] objection, arguing that because Cellebrite worked with law enforcement, it should be willing to come to court. But Brown acknowledged that two-way video would be acceptable "if that's what's necessary." The court concluded Stofik could effectively testify over two-way video.

During trial, a detective testified to finding the cell phones and to the techniques the department used to obtain information about the cell phones and link one of them to Brown. The detective also testified that both of Banks's phones contained a contact named "POE ATL" and that the department traced that contact's number to Anthony Carter. Another detective testified to using Cellebrite software and other tools to extract and analyze information from the phones. Texts on one of Banks's phones

---

[3]*Crawford v. Washington*, 541 U.S. 36 (2004).

SUPREME COURT
OF
NEVADA

(O) 1947A

5

showed that on the morning of the murder, Carter set up a meeting between Banks and an unidentified third person. Phone records admitted at trial also established that Carter was in contact with both Banks and Brown in the minutes leading up to the murder. Additionally, cell tower evidence placed Brown's and Carter's phones in the vicinity of the crime scene in the hours leading up to the murder.

Before Stofik testified, the district court held a sealed hearing, during which Stofik explained Cellebrite's process for receiving and returning phones and for extracting information from those phones. As to Brown's phone, Stofik explained the phone's chain of custody and what he did to extract the data without going into specifics about Cellebrite's trade secrets. He also verified that the information provided to police mirrored what was on the phone and explained how Cellebrite used a "hashing" system to check accuracy. On cross-examination, Brown asked Stofik which of its products was used to extract the data and about the circumstances under which a particular Cellebrite device would be unable to unlock a phone. Stofik declined to answer these questions due to proprietary interests, and the district court thereafter determined the latter question was irrelevant. Although Stofik was not the employee who attempted to extract information the first time the phone was sent to Cellebrite,[4] Stofik explained Cellebrite documented that, during its first attempt, it did not examine or alter any of the applications or data on the device.

Brown then made a *Crawford* objection, arguing he had the right to confront all involved Cellebrite employees about the chain of custody. He also argued the evidence was not properly authenticated

---

[4]That employee left Cellebrite's employment before Stofik arrived.

Supreme Court
of
Nevada

(O) 1947A

6

because Stofik failed to establish the process or system used to extract the data. The district court concluded that the proprietary coding and programming did not need to be presented to the jury, as those areas were technically difficult and could cause the jury undue confusion. The district court overruled the objections and allowed the parties to question Stofik regarding how Cellebrite downloaded and returned the phone information while ensuring its accuracy.

Stofik's subsequent trial testimony matched his testimony at the sealed hearing. Based on Stofik's testimony, the State moved to admit the sealed evidence bag that held the phone, documenting the phone's chain of custody. On cross, Brown primarily asked Stofik about Cellebrite's process and whether Cellebrite ever examined the data on the phone. Later, another detective testified to the messages on Brown's cell phone, which testimony the district court admitted over Brown's objection.

The State also introduced photographs of the bloodied footwear impression taken at the crime scene during its case-in-chief, but the prosecution did not ask any witness at trial to compare those crime scene photographs against the shoes recovered from Brown's residence. However, during closing arguments, the State suggested that the jury should compare them during deliberations.

Brown presented evidence to counter the inference that he fled to Atlanta following the crime and to counter the State's evidence that he fled from officers once located in Atlanta. Brown also testified in his defense and denied meeting or knowing Banks. He asserted that on the day of the murder he was in contact with Carter because he wanted to buy marijuana. They agreed to meet outside a convenience store not far from where Banks was murdered, but while Brown was waiting for Carter, three masked men

robbed and beat Brown, taking his money and his phone.[5] He testified that one of the assailants sounded like Carter and that there were no witnesses to the crime. Brown testified he first learned of the murder after he returned to Atlanta. During cross-examination, the State asked Brown about the text message conversations with Carter, and Brown testified that he did not know what the text message about the knife meant, explaining that he was also calling Carter during that time and that Carter, who was simultaneously texting other people, sent Brown that text on accident. When asked why he had texted "Ok" thirty seconds later, Brown explained that there was an intervening phone call and that the text was in reference to that conversation. He further testified that the text message with the address of the crime was on his phone because he may have dropped Carter off or picked him up at that location, although he also denied having ever been at that location.

The jury convicted Brown on all counts, leading to an aggregate sentence of 30 years and 4 months to life in prison. This appeal followed.

## DISCUSSION

Brown raises several arguments on appeal, two of which we elect to address in this opinion: first, whether the district court improperly admitted evidence of the bloodied footwear impressions without requiring expert testimony; and second, whether the district court violated Brown's rights under the Confrontation Clause by allowing Stofik to testify via two-

---

[5]Brown did not present any corroborating evidence, such as surveillance video or eyewitness testimony.

way video and by limiting the scope of his testimony to avoid disclosing trade secrets.[6]

*The footwear impression evidence in this case was admissible without expert testimony*

Brown argues that the district court abused its discretion in admitting footwear impression evidence without forensic expert testimony because associating footwear impressions with specific shoes is unreliable, prejudicial, and confusing, outweighing any probative value the evidence could have had.[7] Specifically, he contends that the jury needed expert testimony to properly consider the footwear impression evidence admitted at trial and that the State's suggestion during closing argument that the jury should compare the evidence was improper. We review the district

---

[6]Brown additionally argues the district court violated *Batson v. Kentucky*, 476 U.S. 79 (1986), during jury selection and erred by admitting certain text messages and search history from Brown's girlfriend's phone. We have considered the record in light of the relevant law and conclude these arguments are without merit.

[7]Brown also argues that the footwear impression evidence is inadmissible as irrelevant because it is scientifically invalid, based on the 2016 publication of the President's Council of Advisors on Science and Technology (PCAST). *See* President's Council of Advisors on Sci. & Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (Sept. 2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf. But the Department of Justice has since rejected key components of that report, and because this issue may be resolved through existing caselaw, we need not consider the PCAST report. *See* United States Dep't of Justice, *Statement on the PCAST Report: Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (Jan. 13, 2021), https://www.justice.gov/olp/page/file/1352496/download.

court's evidentiary rulings for abuse of discretion. *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008).

Relevant evidence is generally admissible, NRS 48.025(1), and laypersons may draw inferences that are both rationally based on the observer's perception and helpful to determine a fact in issue, NRS 50.265 (addressing lay-witness testimony). Expert testimony, however, is needed "to provide the trier of fact [with] a resource for ascertaining truth in relevant areas outside the ken of ordinary laity." *Valentine v. State*, 135 Nev. 463, 472, 454 P.3d 709, 718 (2019) (alteration in original) (internal quotation marks omitted); *see also* NRS 50.275 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify to matters within the scope of such knowledge."). In a similar context—considering whether a witness is a lay witness or expert witness—we evaluate the substance of the testimony: "[D]oes the testimony concern information within the common knowledge of or capable of perception by the average layperson or does it require some specialized knowledge or skill beyond the realm of everyday experience?" *Burnside v. State*, 131 Nev. 371, 382-83, 352 P.3d 627, 636 (2015). To address Brown's argument, we likewise consider whether comparing footwear impressions to footwear is within an ordinary range of knowledge and capable of perception by the average person, or whether such evidence requires an expert's explanation.

We have never addressed this particular issue, and a survey of other jurisdictions reveals that other courts have come to differing conclusions. Some have upheld the use of expert testimony regarding footwear impression evidence where the circumstances of the case call for

an expert's review. *See, e.g.*, *State v. Cooke*, 914 A.2d 1078, 1097-98 (Del. Super. Ct. 2007) (concluding expert testimony on a footwear impression was admissible where the expert opined that the "perimeter shaped lugs" on the impression may have come from the defendant's boots); *State v. Poole*, 688 N.E.2d 591, 600-01 (Ohio Ct. App. 1996) (determining that footwear impression evidence was beyond the jury's comprehension where the expert in that case testified to taking specific measurements from various points on the defendant's shoe and comparing those measurements to corresponding points on a plaster cast).

However, other courts have determined expert testimony is unnecessary to admit footwear impression evidence. *See, e.g.*, *McNary v. State*, 460 N.E.2d 145, 147 (Ind. 1984) (admitting lay opinion comparing a shoe to shoeprints left in snow and pointing to other law holding that "[f]or the reason that footprints are large and the points of similarity are obvious (contrasted with fingerprints or palm prints), expert testimony is not required and the comparison may properly be made a subject of non-expert testimony" (quoting *Johnson v. State*, 380 N.E.2d 566, 569 (Ind. Ct. App. 1978))); *Castellon v. State*, 302 S.W.3d 568, 572 (Tex. App. 2009) (concluding an analyst was qualified to compare shoe prints left on papers on the ground at the crime scene and in the getaway car against the defendant's shoes, and recognizing that this "field of expertise . . . is not complex" and "Texas courts have long admitted lay and expert testimony on shoe print comparison"); *State v. Yalowski*, 404 P.3d 53, 60 (Utah Ct. App. 2017) (concluding that a technician's testimony as a lay witness comparing footwear impression photographs to the pattern on a pair of shoes was admissible because the technician based his opinion on personal observations, the jurors were free to "form[ ] their own conclusions based on

their observation of the photographs," and the technician "did not opine 'using terms of certainty' or about the 'degree of similarity' between the patterns"); *see also State v. Hall*, 344 S.E.2d 811, 812-13 (N.C. Ct. App. 1986) (allowing police officers to testify that shoe prints appeared to match the defendant's shoes where "the officers though not experts in identifying shoe prints were qualified to compare shoes and shoe prints and testify with respect thereto . . . *that they saw and compared both the shoe prints and shoes involved was foundation enough for their conclusion that the shoes and prints matched*" (emphasis added)).[8]

Based on the foregoing, we conclude that a juror may make personal observations and draw general inferences regarding the similarities between footwear impressions and footwear. *Cf.* NRS 50.265 (explaining a lay witness may testify to an inference rationally based on the witness's perception where it is helpful to determining a fact in issue); NRS 52.045 (allowing jurors to make comparisons between handwriting samples without requiring the aid of an expert). We conclude, in turn, such evidence generally need not be supported by expert testimony to be admissible.[9]

---

[8]*See also State v. Haarala*, 398 So. 2d 1093, 1098 (La. 1981) (concluding that a police officer could testify as a lay witness that the shoeprints he observed "were of the same pattern as would have been made by the defendant's shoes"); *State v. McInnis*, 988 A.2d 994, 995-96 (Me. 2010) (same); *State v. Walker*, 319 N.W.2d 414, 417-18 (Minn. 1982) (same).

[9]This is not to say that expert testimony regarding footwear impressions is never necessary for such evidence's admission. Depending on the circumstances surrounding either the evidence or the nature of the testimony, expert testimony may be appropriate. *See* NRS 50.275 ("If scientific, technical or other specialized knowledge *will assist the trier of fact to understand the evidence* or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or

Here, the photographs of the bloodied shoe prints near Banks's body and the shoes found in Brown's girlfriend's home are independently relevant circumstantial evidence.[10] *See Commonwealth v. Hawk*, 709 A.2d 373, 376 (Pa. 1998) ("Evidence that merely *advances an inference* of a material fact may be admissible, even where the inference to be drawn stems only from human experience."); *United States v. Lloyd*, 462 F.3d 510, 517 (6th Cir. 2006) (determining that, despite the fact that the expert did not identify a shoe print as definitely matching defendant's shoe, the probative value of shoe print evidence was high where defendant was arrested a short distance from crime scene wearing shoes that matched a

---

education *may* testify to matters within the scope of such knowledge." (emphases added)).

[10]In response to our concurring colleague, irrespective of whether the State presented expert testimony of footwear comparison, we emphasize that the photographs of Brown's shoes were independently relevant and admissible. Here, Brown's shoes were presumptively tested by the crime scene analyst for the presence of blood. The crime scene analyst testified that Brown's shoes tested negative for the presence of blood. Thus, this evidence is relevant and independently admissible. *See* NRS 48.025(1) ("All relevant evidence is admissible[.]"); *see also* NRS 48.035(1)-(2) (establishing that relevant and admissible evidence should be excluded where "its probative value is *substantially outweighed*" by certain considerations that would warrant exclusion (emphasis added)). And we have long held that the weight to be given to admissible evidence is left to the jury's determination. *See Wheeler v. State*, 91 Nev. 119, 120, 531 P.2d 1358, 1358 (1975) ("The jury is the sole and exclusive judge of . . . the weight to be given the evidence."). Brown's arguments that the district court erred by admitting the photograph of Brown's shoes without a footwear expert are doubly unavailing because, importantly, the photographs of Brown's shoes were alternatively relevant and exculpatory to explain to the jury that Brown's shoes did not contain the victim's blood that could be seen in the photographs depicting the bloody shoe prints at the crime scene.

shoe print at crime scene); *see also* NRS 48.025 (relevant evidence is generally admissible). Moreover, the photograph of the footwear impression evidence was admitted for the jury's overall observation, and the State elicited no testimony during trial regarding the evidence that would require specialized testimony for the jury to understand. *Cf.* NRS 50.275 (regarding expert testimony). And while expert testimony may have further assisted the jury in forming a particular conclusion about the evidence, this, without more, does not render the photograph inadmissible or require expert testimony to be independently admissible. *Yalowski*, 404 P.3d at 60 ("Simply because a question might be capable of scientific determination, helpful lay testimony touching on the issue and based on personal observation does not become expert opinion." (quoting *State v. Ellis*, 748 P.2d 188, 191 (Utah 1987))).

Finally, the prosecutor did not improperly argue during closing that during deliberations the jury should compare the footwear impressions to the shoes found in Brown's residence. Once evidence is admitted during trial, the prosecutor is free to argue inferences from that evidence. *See Rimer v. State*, 131 Nev. 307, 330, 351 P.3d 697, 714 (2015) (noting that attorneys are free to argue inferences from the evidence admitted at trial during closing arguments). Here, the prosecutor argued to the jury regarding two admitted pieces of evidence, and in doing so, he did not, as Brown contends, improperly shift the burden to the defense where these pieces of circumstantial evidence were of independent significance and nothing in Nevada law either prohibits the prosecutor from arguing as to the evidence's meaning and inferences or requires the prosecutor to base any such argument on expert testimony. Thus, we determine that the

district court did not abuse its discretion by admitting the footwear impression evidence without accompanying expert testimony.

*The district court did not violate Brown's rights under the Confrontation Clause*

Brown argues that the district court violated his rights under the Confrontation Clause by allowing the Cellebrite employee to testify via video conference where the district court failed to make the requisite findings under *Lipsitz v. State*, 135 Nev. 131, 442 P.3d 138 (2019). Brown also argues that the district court improperly limited his ability to cross-examine Stofik because protecting proprietary information and trade secrets is an invalid reason for limiting cross-examination and, moreover, these limitations prevented Brown from understanding Cellebrite's practices and methods and offering adequate rebuttal evidence. Brown further contends that, absent the cell phone evidence, there was no evidence to support the conspiracy charge.

"The Confrontation Clause of the Sixth Amendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *State v. Eighth Judicial Dist. Court (Baker)*, 134 Nev. 104, 106, 412 P.3d 18, 21 (2018) (alteration in original) (quoting U.S. Const. amend. VI). Whether a district court's decision violated a defendant's Confrontation Clause rights is a question of law that we review de novo. *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009).

*Two-way video does not constitute a reversible Confrontation Clause error here*

"'[T]he Confrontation Clause reflects a preference for face-to-face confrontation at trial,' but that preference 'must occasionally give way to considerations of public policy and the necessities of the case.'" *Lipsitz v.*

SUPREME COURT
OF
NEVADA

(O) 1947A

*State*, 135 Nev. 131, 136, 442 P.3d 138, 143 (2019) (emphasis omitted) (quoting *Maryland v. Craig*, 497 U.S. 836, 849 (1990)); *see also* SCR Part IX-A(B) Rule 4(1) (explaining a witness may testify via two-way video if necessary to advance an important public policy and the testimony's reliability is assured). Specifically, in-person cross-examination may not be required under the Confrontation Clause if "denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Lipsitz*, 135 Nev. at 136, 442 P.3d at 143 (internal quotation marks omitted). But the district court must first find that this alternative method of testimony is necessary. *See id.* at 136-37, 442 P.3d at 143 (explaining that such "procedure [may] be used only after the trial court hears evidence and makes a case-specific finding that the procedure is necessary to further an important state interest" (internal quotation marks omitted)). However, even where a Confrontation Clause error occurs, "reversal is not required 'if the State could show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Medina v. State*, 122 Nev. 346, 355, 143 P.3d 471, 477 (2006) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)); *see also* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

Brown's argument focuses on whether the district court made the appropriate findings on *Lipsitz*'s first prong: whether the denial of in-person cross-examination was necessary to further an important public policy. The district court did not expressly make this finding. Stofik was originally scheduled to testify at trial in person, and the State indicated below that moving the testimony to another date, as necessary to accommodate the court's calendar, would place an undue burden on

Supreme Court
OF
Nevada

(O) 1947A

Cellebrite's business and would substantially increase the prosecution's costs. The State argued that in-person testimony would not serve any purpose that could not also be served through audiovisual testimony, and Brown did not contest this point, instead arguing that he would "like to have them live obviously and testify before the jury and let us cross-examine [Stofik in person]," asserting that companies who worked with law enforcement "need[ ] to come to court, period" and that financial concerns were an inadequate reason for failing to appear in person. The district court then agreed with the State that Stofik could effectively testify via two-way video, without specifically addressing what public policy would be served, as required by *Lipsitz*.[11] And although the State raises several considerations on appeal that may, upon further information, be sufficient to establish a public policy reason supporting audiovisual testimony over in-person testimony in this case, those arguments and correlating findings were not made below. *Cf. Lipsitz*, 135 Nev. at 137-38, 442 P.3d at 144 (recognizing that protecting the defendant's right to speedy trial when a witness is unable to testify in person on the day set for trial supports the public policy prong).

However, we conclude that neither the district court's failure to make express findings nor its decision to allow Stofik to testify via two-way video contributed to the verdict, and we therefore conclude any error does

---

[11]Neither party raised *Lipsitz* in the district court or asserted that the district court must make findings regarding the public policy served by two-way video.

not warrant reversal here.[12] The record demonstrates that Brown wanted a Cellebrite employee to testify in order to address his concerns regarding foundational issues, such as the chain of custody of the phone and that Cellebrite's extraction of the data did not alter the contents of the phone's data. The record reflects that Brown was able to cross-examine Stofik on these two points at trial and even more extensively at a sealed hearing that occurred during trial.

Further, Stofik's chain-of-custody testimony was cumulative of other evidence admitted at trial. Stofik did not conduct any analysis or observation of the phone's content. Rather, Stofik's job consisted of using Cellebrite's software to make a copy of the phone's data on a local drive and then a thumb drive, using a unique identifier to ensure accuracy of the copy on the thumb drive. Detectives who handled the phone, transmitted it to Cellebrite, and conducted the forensic analysis of the phone's data upon its return from Cellebrite testified in person at trial, and the State admitted other evidence, such as the sealed evidence bag used to transport the phone to and from Cellebrite, establishing the phone's chain of custody. Indeed, the record shows that, through the cross-examination of Detective Michael Mangione, Brown was able to present to the jury the very same chain-of-custody defect Brown asserts Stofik was unable to properly address during his cross-examination, namely, that the cell phone was sent twice to Cellebrite for data extraction.[13] Thus, Brown had the opportunity to cross-

---

[12]We nevertheless caution that district courts, in considering Confrontation Clause arguments, should make express findings on the record regarding the factors enumerated in *Lipsitz*.

[13]Stofik was unable to explain why Cellebrite's first attempt to unlock the phone failed because he was not the Cellebrite employee who first tried

SUPREME COURT
OF
NEVADA

(O) 1947A

examine multiple witnesses regarding the phone's chain of custody, as well as to cross-examine Stofik concerning the reliability of the copy. *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination . . . .").

Critically, too, Brown himself testified at trial, and the prosecutor cross-examined him about the text messages. Brown acknowledged those messages were tied to his phone number, and he attempted to explain the context and meaning of several of the messages, including, notably, one sent by Carter shortly before the murder regarding items Banks may have in his car, and Brown's quick affirmative response. From Brown's own testimony, therefore, the jurors could determine that Brown sent the text messages and that he, in effect, confirmed the contents of the text messages were accurate. Thus, having determined that the use of two-way video does not require reversal under the particular facts of this case, we next consider whether the district court improperly limited Stofik's testimony.

*The district court did not improperly limit witness testimony*

It is well-established that a criminal defendant has the right to "explore and challenge through cross-examination the basis of an expert witness's opinion." *Blake v. State*, 121 Nev. 779, 790, 121 P.3d 567, 574 (2005). However, it is equally well-established that a defendant's right to confrontation is not unlimited and does not entitle the defense to "cross-

---

the extraction. Stofik did the second extraction, which was successful, and at the time of trial, the employee who had attempted the first extraction no longer worked at Cellebrite. However, Detective Mangione explained that the phone was sent a second time to Cellebrite once police became aware of a Cellebrite software update.

examination that is effective in whatever way, and to whatever extent, the defendant might wish." *Pantano v. State*, 122 Nev. 782, 790, 138 P.3d 477, 482 (2006) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also Gibbs v. Covello*, 996 F.3d 596, 601 (9th Cir. 2021); *United States v. Williams*, 892 F.3d 242, 247 (7th Cir. 2018); *Boyer v. Vannoy*, 863 F.3d 428, 448-49 (5th Cir. 2017); *Davis v. Workman*, 695 F.3d 1060, 1080 (10th Cir. 2012); *Hayes v. Ayers*, 632 F.3d 500, 518 (9th Cir. 2011); *United States v. Thompson*, 538 F. Supp. 3d 1122, 1130 n.40 (D. Nev. 2021); *Evans v. State*, 859 S.E.2d 593, 611 (Ga. Ct. App. 2021); *Shively v. Commonwealth*, 542 S.W.3d 255, 260 (Ky. 2018). "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [a witness's] infirmities through cross-examination." *Pantano*, 122 Nev. at 790, 138 P.3d at 482 (internal quotation marks omitted).

Moreover, the district court retains wide latitude to impose reasonable limits on cross-examination, such as excluding interrogation that is only marginally relevant or would confuse the issues. *See* NRS 48.025(2) ("Evidence which is not relevant is not admissible."); NRS 48.035(1) ("Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury."); *Leonard v. State*, 117 Nev. 53, 72, 17 P.3d 397, 409 (2001); *see also Van Arsdall*, 475 U.S. at 679; *United States v. Fattah*, 914 F.3d 112, 180 (3d Cir. 2019) (providing examples of reasons for limiting the scope of cross-examination); *United States v. Bleckner*, 601 F.2d 382, 385 (9th Cir. 1979) (explaining the trial court's decision to limit cross-examination will not be disturbed absent a clear abuse of discretion); *Davis*, 695 F.3d at 1081 ("There is no recognized constitutional right for criminal defendants to present evidence that is not

relevant and not material to his defense." (internal quotation marks omitted)); *Smith v. State*, 796 S.E.2d 666, 670 (Ga. 2017) (recognizing trial courts retain wide latitude to limit cross-examination).

In considering whether the Confrontation Clause is satisfied despite limits on cross-examination, courts should consider the jury's ability to assess the witness's credibility and specifically "whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *United States v. Mastin*, 972 F.3d 1230, 1239-40 (11th Cir. 2020) (internal quotation marks omitted). Courts should also weigh "the relevance of the excluded evidence, the weight of the interests justifying exclusion, and whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *Gibbs*, 996 F.3d at 602 (internal quotation marks omitted).

We have never addressed whether a court may limit testimony in a criminal trial to protect proprietary rights in trade secrets. However, both Nevada and federal law accord special protection to trade secrets in civil litigation, *see* NRCP 26(c)(1)(G); FRCP 26(c)(1)(G), and other courts have determined trade secrets present a significant private interest that must be weighed in determining the extent to which disclosure is required. *See, e.g.*, *Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 611 F. Supp. 2d 572, 581-82 (E.D. Va. 2009) (compiling law). In considering whether to limit cross-examination regarding trade secrets, therefore, a court should consider whether, given the importance of the private interest at stake, the cross-examination is designed to harass, annoy, or humiliate the witness; whether it would cause prejudice or place the witness in danger; and whether it would confuse the issues, be repetitive of other testimony, be

speculative or vague, or be only marginally relevant. *Cf. Leonard*, 117 Nev. at 72, 17 P.3d at 409.

Considering the record in this case, we conclude the district court did not clearly abuse its discretion by limiting cross-examination. It is not clear to us that the excluded evidence was so relevant as to necessitate admission, given the interests at stake. Brown cross-examined Stofik regarding the core issues of chain of custody and the reliability of the evidence, and the district court's concern that delving into technical details may unnecessarily confuse the jury is a valid one. *See* NRS 48.035. Moreover, the district court found that at least part of Brown's cross-examination was of no relevance, and we agree that the circumstances under which Cellebrite would be unable to unlock a phone is of little, if any, relevance here and limiting that line of questioning was proper. As to the general limits on cross-examining Cellebrite regarding the details of its technology, Brown did not, and on appeal Brown still has not, provided any reason why Cellebrite's extraction process is not reliable. *See People v. Cialino*, 831 N.Y.S.2d 680, 682 (N.Y. Crim. Ct. 2007) ("The defendant has not provided the court with a reasonable basis to believe that any software changes and upgrades have caused the [device] used in this case to be unreliable."). Finally, to the extent Brown was unable to cross-examine Stofik on possible deficiencies in the chain of custody, those deficiencies would go to the weight of the evidence rather than its admissibility and do not amount to a Confrontation Clause violation here, where Stofik testified to the data duplication process and its safeguards and Brown had the

Supreme Court
of
Nevada

(O) 1947A

22

opportunity to cross-examine Stofik on those points.[14] *Cf. United States v. Gorman*, 312 F.3d 1159, 1163 (10th Cir. 2002) ("[D]eficiencies in the chain of custody go to the weight of the evidence, not its admissibility . . . ." (internal quotation marks omitted)); *see also Sorce v. State*, 88 Nev. 350, 352-53, 497 P.2d 902, 903 (1972) (explaining that establishing the chain of custody does not require that all possibility of tampering be eliminated or that each custodian testify to her or his involvement, so long as the evidence provides reasonable certainty that there was no tampering or substitution).

In sum, the record does not show that limiting the testimony left the jury with insufficient information to judge Stofik's credibility regarding the core issues or that a reasonable jury would have received a significantly different impression of Stofik's credibility had the district court not limited the scope of cross-examination. And importantly, as explained above, ultimately Brown's own testimony independently established the accuracy of those text messages. Accordingly, we determine that the district court did not violate the Confrontation Clause by limiting Stofik's testimony to avoid disclosing Cellebrite's trade secrets.[15]

---

[14]To the extent Brown argues the district court should have allowed cross-examination on these points in the sealed hearing specifically, we disagree for the reasons stated here.

[15]Even had the district court erred, we conclude any error would have been harmless under the facts of this case. *See Medina v. State*, 122 Nev. 346, 355, 143 P.3d 471, 477 (2006) (setting forth considerations for determining harmless error). The record belies Brown's argument that no other evidence besides the text messages established conspiracy. Cell tower evidence placed Brown and Carter near the crime scene. Cell phone records showed that Carter was in contact simultaneously with both Brown and Banks immediately before the murder. Critically, Brown's phone and DNA were found at the crime scene. All of this evidence supports the existence of a conspiracy. *See Nunnery v. Eighth Judicial Dist. Court*, 124 Nev. 477,

## CONCLUSION

We conclude that the jury could consider photographs of footwear impressions along with those of Brown's shoes without the aid of an expert witness here because both pieces of evidence were independently admissible as circumstantial evidence. We further determine reversal is not warranted for the district court's failure to make express findings under *Lipsitz v. State*, 135 Nev. 131, 442 P.3d 138 (2019), regarding the use of two-way video for a witness's testimony, and that the district court did not abuse its discretion by limiting cross-examination to avoid disclosing trade secrets. Accordingly, we affirm the judgment of conviction.[16]

_____, J.
Silver

I concur:

_____, J.
Cadish

---

480, 186 P.3d 886, 888 (2008) (defining a conspiracy as an agreement between at least two people for an unlawful purpose).

[16]Brown also argues cumulative error warrants reversal. Because we find no errors to cumulate, we reject this argument. *See Pascua v. State*, 122 Nev. 1001, 1008 n.16, 145 P.3d 1031, 1035 n.16 (2006) (rejecting appellant's argument of cumulative error where the "errors were insignificant or nonexistent").

 

PICKERING, J., concurring:

I join the majority but write separately to explain the admissibility of the photographs of the tread of Brown's shoe and the shoe print found at the crime scene, despite the State not having introduced any lay or expert witness testimony establishing their relationship to each other.

To start, only relevant evidence is admissible. *See* NRS 48.025. And to be relevant, evidence must have some effect on a fact "of consequence" in the case. NRS 48.015. Here, that fact is Brown's disputed presence at the murder scene at the time of the murder. Foundation is a special aspect of relevance because "evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims." *Rodriguez v. State*, 128 Nev. 155, 160, 273 P.3d 845, 848 (2012) (quoting *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992)). "[T]he party offering the evidence, by deciding what she offers it to prove, can control what will be required to satisfy the [foundation] requirement." 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 7104 (2d ed. 2021); *see also Rodriguez*, 128 Nev. at 160-61, 273 P.3d at 848-49. "But there is a significant limitation on the power of a party offering evidence to decide what she claims it to be: the party's claims must be consistent with the item's relevance." 31 Wright & Gold, *supra*, § 7104.

Understanding that, a proper foundation for the State to introduce the photograph of Brown's shoe entails more than a showing that the photograph depicts Brown's shoe. A photograph of a suspect's shoe, without more, no matter how accurately and painstakingly done, is irrelevant to a murder case. *See id.* (discussing hypothetical in which the

prosecution introduces a gun as an exhibit but fails to connect it with the crime); *see also Huddleston v. United States*, 485 U.S. 681, 689 (1988) (explaining that relevancy is a matter of relations). For the photograph to be admissible under the State's theory, the State needed to lay a foundation establishing that the photograph depicts Brown's shoe *and* that Brown's shoe could have made the print at the crime scene on the night of the murder.[1] In other words, for the photographs of Brown's shoe and the crime scene shoe print to come in, the State needed to connect them. *See, e.g., United States v. Lloyd*, 462 F.3d 510, 517 (6th Cir. 2006) (explaining that if the government's evidence showed only that a right shoe made a print at the crime scene and the defendant wore a right shoe, then the defendant "would be correct" that this "would have little, if any, probative value"); *State v. Sigman*, 261 N.W. 538, 539 (Iowa 1935) ("The fact that a heel mark was found upon a slip of paper lying on the floor near the safe might be a strong circumstance tending to connect the defendant with the commission of the crime . . . *if* the evidence showed that the heel mark on the exhibit had distinctive peculiarities on it similar to those on the heel of defendant's shoe . . . ." (emphasis added)). Otherwise, they were irrelevant.[2]

---

[1]In closing argument, the State urged the jury to look at the crime scene print, asking them, "can you look at that as reasonable men and women and say that's not Larry Brown's shoe in the middle? I'll let you make that determination."

[2]I disagree that the photographs were independently relevant circumstantial evidence. Without a connection, the photograph of Brown's shoe shows only that Brown owned shoes, and the photograph of the crime scene print shows only that the murderer wore shoes. Neither of these facts alters the probabilities of the case in any way. *See* NRS 48.015.

Boiled down, then, this is a problem of foundation, related to the concept of conditional relevancy. *See Rodriguez*, 128 Nev. at 160, 162 n.5, 273 P.3d at 848, 849 n.5 (explaining that foundation is a "special aspect of relevancy," essentially "a question of conditional relevancy") (quoting *United States v. Branch*, 970 F.2d 1368, 1370-71 (4th Cir. 1992)); David S. Schwartz, *A Foundation Theory of Evidence*, 100 Geo. L.J. 95, 110 (2011) ("While foundation is often held to be a special case of conditional relevance, the reverse is true: conditional relevance is an aspect of foundation."). By statute, the requirement of foundation "as a condition precedent to admissibility is satisfied by evidence or other showing *sufficient to support a finding* that the matter in question is what its proponent claims." NRS 52.015(1) (emphasis added). So here, the district court's task was deciding whether there was sufficient evidence for the jury to reasonably find that Brown's shoe could have made the print at the scene. *See Huddleston*, 485 U.S. at 690 ("The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact—here, that the televisions were stolen—by a preponderance of the evidence.").

This is an unusual case. The picture of the bloody shoe print is clear and depicts the tread pattern of the footwear that made it. Correspondingly, the sole of Brown's shoe has a matching "V"-patterned tread running down the middle. Given the similarities between the design of Brown's tread and the crime scene print, their obvious distinctive features, and other evidence indicating Brown's presence, the court did not abuse its discretion in finding that the jury could rely on its own knowledge and common sense to draw the conclusion that Brown's shoe could have made the print at the crime scene. *See* NRS 52.015(2) (explaining that the statutory examples of foundation are illustrative, not restrictive);

*Middleton v. State*, 114 Nev. 1089, 1105, 968 P.2d 296, 307 (1998) (acknowledging the jury's capacity "to make logical inferences" from evidence); Fed. R. Evid. 901(b)(3) (explaining that comparison by an expert witness or the trier or fact may lay a foundation for evidence); Fed. R. Evid. 901(b)(4) (stating that foundation may be shown based on distinctive characteristics). Of course, Brown was free to urge the jury to find otherwise, through evidence or argument. *See Rodriguez*, 128 Nev. at 162 n.5, 273 P.3d at 849 n.5 (explaining that even after evidence is admitted, the opponent may challenge its foundation).



This conclusion should be limited based on the unusually obvious characteristics of the evidence in question, particularly given the extensive critiques of feature-comparison methods of forensic science evidence. *See, e.g.*, Jane Campbell Moriarty, *Deceptively Simple: Framing,*

 

*Intuition, and Judicial Gatekeeping of Forensic Feature-Comparison Methods Evidence*, 86 Fordham L. Rev. 1687, 1688 (2018) ("For decades, scientists and legal academics have been highly critical of claims that [feature-comparison methods of forensic science evidence have] a reliable foundation and can reliably match a known and unknown sample."). The State could not, for example, introduce a photograph of a fingerprint found at the crime scene and a photograph of the defendant's fingerprint, without other evidence (generally, expert testimony) establishing that the crime scene print was consistent with the defendant's. *See* 5 *Jones on Evidence* § 34A:36, 34A:40 (7th ed. Supp. 2022) (explaining that admitting fingerprint evidence involves an expert "comparing the latent prints lifted from the crime scene or other crime-relevant location" and the defendant's prints). Without such testimony, the photographs would lack foundation, *see* NRS 47.070(1); NRS 52.015(1), and the jury would be asked to come to a conclusion that is beyond its ability, knowledge, and common sense. *See* 31 Wright & Gold, *supra*, § 7208 ("[T]he court may refuse to permit a jury to make [a] comparison [for purposes of authentication under Federal Rule of Evidence 901(b)(3)] where the jury cannot reasonably be expected to reach a reliable conclusion because the complexity or esoteric nature of the matters to be compared requires an expert.").

Moreover, and for similar reasons, the evidence rules instruct district courts to exclude relevant evidence where its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035(1). As a result, the district court has discretion to exclude probative evidence that will cause the jury to unfairly speculate, especially where there is a danger that the jury will simply assume the evidence favors the State because the State

SUPREME COURT
OF
NEVADA

(O) 1947A

5

chose to introduce it. *See, e.g., Graham v. Firestone Tire & Rubber Co.*, 357 N.W.2d 666, 668 (Mich. Ct. App. 1984) (approving trial court's exclusion of evidence because of the "danger of unfair innuendo and jury speculation"); *Grant v. State*, 205 P.3d 1, 20 (Okla. Crim. App. 2009) (approving trial court's exclusion of records because "[m]any of these reports contain information and terminology which might be confusing to someone outside the world of psychology and psychiatry"). Because prejudice "does not inhere in evidence but arises from the way in which a particular jury will respond to it," it is for the district court to proactively assess what a jury is likely to make of evidence that is offered for admission. 22A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5215.1 (2d ed. 2014).

Thus, while I reach the same conclusion as the majority as to the admissibility of the photographs, these bedrock principles guide my analysis, and I would limit our holding to the application of those principles to these unique facts. Because I do not believe that the district court abused its discretion in finding that the photographs were authenticated, relevant, and not more unfairly prejudicial than probative, and otherwise join the majority opinion, I concur.

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A